**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
ONE MARITIME PLAZA, SIXTH FLOOR
SAN FRANCISCO, CA 94111-3409
TELEPHONE: 415.434.4484
FACSIMILE: 415.434.4507

EILEEN R. RIDLEY, CA BAR NO. 151735
 E-MAIL: ERIDLEY@FOLEY.COM
JASON M. JULIAN, CA BAR NO. 215342
 E-MAIL: JJULIAN@FOLEY.COM
ONE MARITIME PLAZA, SIXTH FLOOR
SAN FRANCISCO, CA 94111-3409
TELEPHONE: 415.434.4484
FACSIMILE: 415.434.4507


ATTORNEYS FOR PLAINTIFF GIA-GMI, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIA-GMI, LLC, a Florida Limited Liability Company,<br><br>             Plaintiffs,<br>v.<br><br>DANIEL R. MICHENER, an individual, JAMES M. MCWALTERS, an individual, CHARLES D. TOY, an individual, ALLAN M. DUNN, an individual, LARRY J. AUSTIN, an individual, W. DENMAN VAN NESS, an individual, MICHAEL P. SALUCCI, an individual, COMPUTER AND SOFTWARE ENTERPRISES, INC., a California corporation, PANGAEA HOLDINGS, LLC, a dissolved Delaware limited liability company, and PANGAEA TRADING CORPORATION, a Delaware corporation<br><br>             Defendants. | Case No.  C 06-7949 SBA<br><br>**GIA-GMI, LLC'S FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, GIA-GMI, LLC ("Plaintiff") sues the Defendants, PANGAEA HOLDINGS, LLC ("Pangaea Holdings"), PANGAEA TRADING CORPORATION, ("Pangaea Trading"), COMPUTER AND SOFTWARE ASSOCIATES, INC., ("CASE"), GMI CAPITAL CORPORATION ("GMICC"), DANIEL R. MICHENER ("Michener"), JAMES M. MCWALTERS ("McWalters"), CHARLES D. TOY ("Toy"), ALLAN M.

SFCA_429700.1

DUNN ("Dunn"), LARRY J. AUSTIN ("Austin"), W. DENMAN VAN NESS ("Van Ness") and MICHAEL P. SALUCCI ("Salucci"), (the individual Defendants are collectively referred to as "Individual Defendants") (all Defendants are collectively referred to as "Defendants"), and alleges as follows:

<u>**General Allegations**</u>

<u>**The Parties**</u>

1.     Plaintiff is a Florida limited liability company with its principal place of business in Duval County, Florida.

2.     Defendant Pangaea Holdings is a dissolved Delaware limited liability corporation which maintained its principal place of business in Santa Clara County, California.

3.     Defendant Pangaea Trading is a Delaware corporation with its principal place of business in Santa Clara County, California.

4.     Defendant Michener is an individual who, upon information and belief, resides in San Jose County, California.  At all relevant times, Defendant Michener was the President and CEO of GMI Capital Corporation ("GMICC"), the President of Pangaea Holdings, and the CEO and a Board Member of Pangaea Trading.

5.     Defendant McWalters is an individual residing in Orange County, California.  At all relevant times, Defendant McWalters was the Chief Credit Officer of GMICC, the Executive Vice President of Pangaea Holdings and the Executive Vice President of Pangaea Trading.

6.     Defendant Toy is an individual residing in Montgomery County, Maryland.  At all relevant times, Defendant Toy was the Executive Vice President of GMICC, the Executive Vice President of Pangaea Holdings and the Executive Vice President of Pangaea Trading.

7.     Defendant Dunn is an individual residing in Washington, D.C.  At all relevant times, Defendant Dunn was a director of GMICC, Pangaea Holdings and

SFCA_429700.1

Pangaea Trading.

8.     Defendant Austin is an individual residing in Alexandria County, Virginia. At all relevant times, Defendant Austin was a director of GMICC, Pangaea Holdings and Pangaea Trading.

9.     Defendant Van Ness is an individual residing in Alameda County, California.   At all relevant times, Defendant Van Ness was a director of GMICC, Pangaea Holdings and Pangaea Trading.

10.     Defendant Salucci is an individual residing in San Luis Obispo County, California.  At all relevant times, Defendant Salucci was a director of GMICC, Pangaea Holdings and Pangaea Trading.

11.     Defendant CASE is a California corporation with its principal place of business in San Luis Obispo County, California.  At all relevant time, Defendant Salucci was the principal owner of CASE.

**Jurisdiction and Venue**

12.     GMICC is a dissolved Delaware corporation, which had its principal place of business in San Mateo County, California.

13.     Federal jurisdiction exists under 28 U.S.C. § 1332 as complete diversity of citizenship exists between the parties and the amount in dispute exceeds $75,000. Federal question jurisdiction also exists under 28 U.S.C. § 1331 for Plaintiff's claims under the Securities and Exchange Act of 1934.

14.     Jurisdiction and venue are proper in this Court because GMICC had its principal place of business in California and all the meetings of the GMICC Board of Directors took place in San Mateo County, California.  Thus, the majority of the acts and/or omissions by the Individual Defendants giving rise to Plaintiff's causes of action alleged herein took place and/or were directed into California.

15.     Jurisdiction is proper against Defendants Pangaea Holdings, Pangaea Trading and CASE because their principal place of business is in California.

SFCA_429700.1

## GMICC's Business Plan

16. Defendant Michener was the President and CEO of GMICC. Defendant McWalters was the Chief Credit Officer of GMICC, and Defendant Toy was the Executive Vice President of Government Affairs of GMICC. Defendants Dunn, Van Ness, Austin and Salucci were Directors of GMICC. All of these Individual Defendants were also shareholders in GMICC.

17. The business plan of Defendant GMICC was to operate as a non-regulated finance company that would provide loans to small to medium enterprise ("SME") technology companies selling to larger companies in emerging markets such as Thailand and Singapore.

18. One primary source of funds from which GMICC would finance such loans was to come from a larger loan to GMICC from the Overseas Private Investment Corporation, ("OPIC").

19. OPIC is a federal government corporation whose purpose is to mobilize and facilitate the participation of United States private capital and skills in the economic and social development of less developed countries and areas, and countries in transition from non-market to market economies.

20. Certain officers and directors of GMICC had prior relationships with OPIC and/or the federal government, and GMICC planned to use those connections to assist GMICC in obtaining the OPIC funding. Specifically, Defendant Toy was the former Vice President and General Counsel of OPIC, and Defendant Dunn was the former United States Assistant Secretary of Commerce. In addition, Defendant Dunn had a close personal relationship with the then President of OPIC, Mr. Peter Watson.

21. GMICC was seeking a $25 million loan from OPIC and had obtained a commitment letter in September, 2003, from OPIC committing to close the loan to GMICC by March, 2004, if GMICC complied with certain conditions.

///

GIA-GMI, LLC'S FIRST AMENDED COMPLAINT FOR DAMAGES
Case No.: C 06-7949 SBA

SFCA_429700.1

22.     Primary among these conditions was that GMICC had to raise approximately $4 million in capital investment from outside sources prior to the closing of the OPIC loan.

23.     In order to process the loans GMICC planned to make once it closed on the OPIC loan, GMICC purchased from CASE a license for certain loan processing software, as well as computer hardware to run the software, and a maintenance program ("Case Loan Processing Program"). GMICC purchased this CASE Loan Processing Program from CASE through GMICC's wholly owned subsidiary company, GMI Asia Ltd., located in Singapore. As reflected in the invoice from CASE attached hereto as **Exhibit A**, CASE charged GMI Asia Ltd., $187,529.16 for the CASE Loan Processing Program.

24.     In order to pay for the CASE Loan Processing Program for its subsidiary, GMICC gave CASE a promissory note. However, on or about December 31, 2003, the debt evidenced by the promissory note was converted into stock in GMICC by CASE.

25.     As a result of this transaction, CASE, obtained 187,529 shares of Series B Preferred Stock in GMICC, as well as a warrant to purchase 187,529 more shares of GMICC Series B stock.

**Defendants Dunn and Michener**
**Fraudulently Induce Plaintiff to Loan Monies to GMICC**

26.     In late December, 2003, Defendants Dunn and Michener approached Plaintiff in order to solicit a monetary investment in GMICC from Plaintiff of $500,000 to $750,000. Discussions between Plaintiff, on the one hand, and Defendants Dunn and Michener, on the other hand, regarding Plaintiff's potential investment in GMICC continued through January 2004. Defendants Dunn and Michener initially sought an equity investment from Plaintiff and therefore provided Plaintiff in Florida with GMICC's Confidential Private Placement Memorandum dated January, 2004 ("January 2004 PPM"). A true and correct copy of the January 2004 PPM is attached hereto as **Exhibit B.**

///

SFCA_429700.1

27.     Plaintiff is informed and believes, and thereon alleges that the January 2004 PPM was issued in order to induce equity investment in GMICC and that Defendants Dunn and Michener provided the January 2004 PPM to Plaintiff for that purpose.  The January 2004 PPM made the following pertinent material representations:

a.     GMICC planned to raise $1.5 million through a Series B equity offering of preferred stock, which was to be done *prior to receipt* of the OPIC loan.  **Exhibit. B**, p. 8.

b.     "To complement the $25,000,000 senior secured debt facility from OPIC, [GMICC] [would] raise approximately $12.5 million in private capital (the "Series C") through [GMICC] and will invest most or all of the proceeds into GMIA."  **Exhibit B,** p. 6.

c.     The January 2004 PPM also contained forward looking financial statements for GMICC for 2004 including one projection which indicated that GMICC would have "Cash at Bank" at the end of 2004 of $1,504,950.  **Exhibit B,** Appx. II, p. 9.

28.     In January 2004, and after having received the January 2004 PPM, Plaintiff expressly informed Defendants Dunn and Michener that he was not interested in an equity investment in GMICC but, instead, was interested in an investment in the form of a secured loan, which would be repaid with interest, or could be converted into equity at Plaintiff's sole option based upon certain pre-conditions.

29.     Having been informed of Plaintiff's inclination to invest in GMICC through a loan, Defendants Dunn and Michener expressly represented to Plaintiff in January 2004 that, notwithstanding the warnings in the PPM regarding the risk of any investment in GMICC, the OPIC loan to GMICC was virtually certain given the September 2003 commitment letter, the additional financing anticipated by Defendants Dunn and Michener (*i.e.*, through the "Series B" and "Series C" financing), as well as Dunn's purported personal relationship with the President of OPIC.

SFCA_429700.1

30.     Further, in January 2004, and knowing that Plaintiff was only interested in investing in GMICC through a loan to be repaid (not as an equity participant), Defendants Dunn and Michener represented to Plaintiff that GMICC would have sufficient cash on hand at the maturity date of the loan to repay the loan.  Indeed, Defendants Dunn and Michener represented that Plaintiff's contemplated loan to GMICC would be paid *in cash* when due (in December 2004) either through the $1.5 million raised through Series B equity stock, and/or through the $12.5 million raised through private capital (the "Series C"), and/or through the funds received through the OPIC loan and/or from funds through business operations.  In short, Defendants Dunn and Michener represented that GMICC would be able to repay Plaintiff's contemplated loan in cash regardless of whether any loans or other financing came through.

31.     In reliance upon the representations in the January 2004 PPM noted herein and the additional representations from Defendants Dunn and Michener described above, Plaintiff agreed to enter into an investment in GMICC in the form of a short term loan which was to be repaid in cash by December 2004.

32.     On February 6, 2004, Plaintiff loaned the principal sum of $500,100.00 to GMICC pursuant to a Convertible Secured Note allowing for a total loan of $750,000, a true and correct copy of which, as amended, is attached hereto as **Exhibit C** ("Note"). The Note was drafted by counsel representing Defendants.  Plaintiff later funded an additional $9,900.00 to GMICC pursuant to the terms of the Note on or about May 3, 2004.

33.     Subsequently, on or about June 22, 2004, a further $240,000 was funded to GMICC pursuant to the terms of the Note through another entity, U.S. Real Estate Consortium, LLC, from which GMICC had solicited and procured a blind participation in the Note.

///

///

GIA-GMI, LLC'S FIRST AMENDED COMPLAINT FOR DAMAGES
Case No.:  C 06-7949 SBA

SFCA_429700.1

34.     The Note contained the following pertinent and material terms:

a.     The entire principal sum loaned to GMICC, with 10% interest, was due and payable to Plaintiff *in cash* on December 1, 2004 (the "Maturity Date"). **Exhibit C**, ¶ B(1).

b.     GMICC was expressly forbidden from prepaying the Note any earlier than the Maturity Date of December 1, 2004, unless Plaintiff consented in writing to such a prepayment. **Exhibit C**, ¶ B(2).

c.     Plaintiff, *at its sole option*, could convert "all or any part of the principal balance" under the Note into equity in GMICC. However, any such conversion was also "contingent upon, the closing of a Financing or Sales Transaction." **Exhibit C**, ¶ D(1).

d.     A "Financing Transaction" is defined as "the sale or issuance of equity or debt securities in one or a series of transactions in which [GMICC] receives net proceeds of at least $5,000,000." **Exhibit C**, ¶ E(1).

e.     A "Sales Transaction" is defined as "a merger, consolidation, other business combination, sale or other disposition of all or substantially all of the assets of [GMICC] or any other circumstance that would result in the payment of a liquidation preference to or on account of any class or series of [GMICC's] capital stock." **Exhibit C**, ¶ E(1).

f.     Even if there was a Financing or Sales Transaction, and Plaintiff chose, in its sole discretion, to convert the debt, GMICC was still required to pay the accrued interest to Plaintiff in cash under the terms of the Note. **Exhibit C**, ¶ D(3).

35.     Thus, the principal (and not the interest) portion of the debt could be converted only by Plaintiff, at its sole discretion, and only if GMICC was either: 1) able to raise cash of at least $5,000,000 through an equity or debt offering; or 2) GMICC was merged, consolidated or sold to another company. **Exhibit C**, ¶ D(1) and E(1). If neither

SFCA_429700.1

of these events happened, the debt could not be converted, and remained due and payable in full, and with 10% interest, on December 1, 2004 and could not be prepaid by GMICC.

36.     Plaintiff is informed and believes, and thereon alleges, that each of the above described representations to Plaintiff by Defendants Dunn and Michener in January 2004 - *i.e.*, that GMICC, (1) would raise $1.5 million through Series B equity *prior* and in addition to the OPIC loan, (2) would raise $12.5 million in private capital in addition to the OPIC Loan, (3) would have sufficient cash on hand on December 2004 to pay Plaintiff's loan off in full and in cash, and (4) that the OPIC Loan was virtually certain regardless of the warnings in the 2004 PPM regarding the risk of investment - were, in fact, false and were made to Plaintiff by Defendants Dunn and Michener for the sole purpose of inducing Plaintiff to rely upon such false representations and thereby enter the loan arrangement described herein to Plaintiff's detriment.  Plaintiff is further informed and believes, and thereon alleges, that Defendants Dunn and Michener knew that the above described representations were, in fact, false when they were made to Plaintiff and that Defendants Dunn and Michener knew that, in fact, GMICC would not have sufficient funds to pay Plaintiff's loan and would not be able to obtain either the OPIC loan or any additional funds through the sale of equity participation offerings or otherwise.  Despite knowing that GMICC (and Defendants Dunn and Michener) had no reasonable belief that GMICC could repay Plaintiff's loan by the maturity date, Defendants nevertheless falsely represented to Plaintiff otherwise in order to induce Plaintiff to invest in GMICC through the loan arrangement.

37.     Defendants Dunn's and Michener's knowledge of the falsity of their representations to Plaintiff is evidenced by a January 15, 2004 email to Defendant Dunn from Defendant Michener (the "January 15, 2004 Email"), a true and correct copy of which is attached hereto as **Exhibit D.**  Again, although Defendants Dunn and Michener knew at that time the January 15, 2004 Email was sent that Plaintiff was actively considering an investment in GMICC, the email was not provided to Plaintiff.

SFCA_429700.1

Significantly, in the January 15, 2004 Email Defendant Michener explains to Defendant Dunn why they did not want to repay Plaintiff's loan to GMICC in cash as promised. Specifically, Defendant Michener explains that such a cash payment to Plaintiff would raise serious problems with GMICC's ability to procure equity investment in the planned Series C equity offering. Defendant Michener informed Mr. Dunn that he believed that "the Series C won't put $$$ in if there is a clause that allows the [Plaintiff] to take $500,000 to $600,000 out of the company when the Series C is funded." Thus, Defendants Dunn and Michener knew at the time the above-described representations to Plaintiff were made that they were not going to repay Plaintiff's loan in cash (as required or as they had promised), or maintain sufficient cash in GMICC to do so, but were instead planning on having the debt to Plaintiff converted into equity – even though they knew that that was not Plaintiff's desire and that Plaintiff retained the sole right of such a conversion. The statements made in the January 15, 2004 Email are expressly contrary to Defendant Dunn's and Michener's contemporaneous promises to Plaintiff in January 2004 that GMICC would have sufficient cash in December 2004 to repay Plaintiff's loan in full and with interest.

38. Notwithstanding the fact that the concealed January 15, 2004 indicated Defendants Dunn's and Michener's true (but concealed) intention not to pay Plaintiff's loan in cash when it became due in December 2004, Defendant Dunn still promised Plaintiff in an email dated January 23, 2004, that Plaintiff could obtain a "cash payment" at the closing of the OPIC loan (the "January 23, 2004 Email). A true and correct copy of the January 23, 2004 Email is attached hereto as **Exhibit E.** Defendant Dunn made this representation even though he knew that he and Defendant Michener did not intend to cause Plaintiff to be repaid in cash because they believed that such a cash payment to Plaintiff would raise serious problems with GMICC's ability to procure equity investment in the Series C equity offering.

///

SFCA_429700.1

39.     In addition, Defendants Dunn and Michener knowingly made the above-described false representations to induce Plaintiff to invest in GMICC through the loan arrangement and thereby used the funds received from Plaintiff for their own benefit by paying themselves salaries and/or fees despite their knowledge of GMICC's financial difficulties (which salary and/or fees Defendants Dunn and Michener would not have received except for Plaintiff's loan).  In fact, in a January 19, 2004 email from Defendant Michener to Defendant Dunn (not provided to Plaintiff), Defendant Michener expressly tells Defendant Dunn that Defendant Michener has created budgets for GMICC where cash compensation for Defendant Dunn "**is buried in the line called 'Consultants'**…".

40.     Plaintiff would not have loaned any money to GMICC if it had known the true intentions of Defendants Dunn and Michener prior to making the loan.  Specifically, Plaintiff would not have made the loan to GMICC if Plaintiff had known the following:

a.      That even if GMICC received the OPIC loan, Defendants Dunn and Michener did not intend to use the OPIC loan monies to repay Plaintiff at the end of the loan term as promised;

b.      That Defendants Dunn and Michener did not intend to otherwise maintain sufficient cash assets available in GMICC to repay Plaintiff at the end of the loan term as promised, and indeed planned to use these assets for, among other things, payments to themselves as salaries and/or fees;

c.      That the viability of GMICC receiving the OPIC loan was not "virtually certain" and, in fact, was in peril due to Defendants Dunn's and Michener's undisclosed knowledge that GMICC was having serious problems with raising the requisite financing.

41.     In reasonable reliance on the previously described representations of Defendants Michener and Dunn, Plaintiff made the decision to enter into the loan transaction with GMICC pursuant to the terms of the Note.

///

GIA-GMI, LLC'S FIRST AMENDED COMPLAINT FOR DAMAGES
Case No.:  C 06-7949 SBA

SFCA_429700.1

42.    In connection with the Note, GMICC also executed a security agreement ("Security Agreement"), whereby GMICC granted Plaintiff a security interest in all of GMICC's then existing and future assets in order to secure repayment of GMICC's obligations under the Note.    A true and correct copy of the Security Agreement is attached hereto as **Exhibit F**.

43.    Plaintiff properly perfected the Security Agreement by filing it with the appropriate authorities as required by Delaware law.   Pursuant to the Note and Security Agreement, Plaintiff was by far GMICC's largest creditor, and its only secured creditor.

**Defendants Michener and McWalters**
**Fraudulently Induce Further Funding of the Loan Pursuant to the Note**

44.    As alleged above, Plaintiff was fraudulently induced into funding $500,100 to GMICC under the Note.

45.    After Plaintiff funded $500,100 of the Note, GMICC sought additional funding of the remaining $240,000 for a total loan amount of $750,000 which could be loaned to GMICC pursuant to the Note.

46.    In order to obtain this additional funding, Defendants Michener and McWalters contacted Mr. Javed Nawaz ("Mr. Nawaz") to attempt to convince him, through his company, U.S. Real Estate Consortium ("USRE"), to loan this additional $240,000 to GMICC through a participation in the Note.

47.    On or about April 29, 2004, Defendants Michener and McWalters had a meeting with Mr. Nawaz, as well as the attorney for Mr. Nawaz and USRE, Mr. Matthew L. Tonkovich, Esq. ("Mr. Tonkovich"), in order to solicit USRE's participation in the Note.   The meeting occurred in Mr. Tonkovich's office, with Defendant McWalters attending in person and Defendant Michener attending via telephone conference.

48.    During this meeting, Defendants Michener and McWalters represented to Mr. Nawaz and Mr. Tonkovich that GMICC was guaranteed to receive the OPIC loan shortly, and that once GMICC received the OPIC loan, GMICC had a back log of loans and other investment deals which would flow in to GMICC.   Defendants Michener and

SFCA_429700.1

McWalters represented that once this happened, USRE could convert its loan into equity and obtain a significant return on its investment.

49.     Defendants Michener and McWalters never indicated to Mr. Nawaz or Mr. Tonkovich that there was not sufficient cash in GMICC for repayment if USRE chose to have its portion of the loan repaid in accordance with the terms of the Note.

50.     Defendants Michener and McWalters made these representations to Mr. Nawaz in order to induce USRE to loan the additional $240,000 to GMICC under the terms of the Note, and Defendants Michener and McWalters intended for Mr. Nawaz and USRE to rely on their representations.

51.     In justifiable reliance on the representations of Defendants Michener and McWalters during this meeting, USRE decided to fund the remaining $240,000 of the Note directly to GMICC. The funding was documented pursuant to the terms of a Participation Agreement between USRE and Plaintiff. A true and correct copy of the Participation Agreement is attached hereto as **Exhibit G**.

52.     While Plaintiff and USRE were parties to the Participation Agreement, the Participation Agreement was drafted by GMICC and provided to USRE and Plaintiff to sign so that GMICC could obtain the additional loan monies from USRE under the terms of the Note. Moreover, as Defendants Michener and McWalters were soliciting USRE to fund the remaining portion of the $750,000.00 pursuant to the Note between Plaintiff and GMICC, USRE was in effect an agent for Plaintiff in its dealings with Defendants Michener and McWalters, such that these Defendants in effect solicited the additional investment by Plaintiff under the Note through the investment by USRE.

53.     Plaintiff and USRE never had any discussions related to the Note, the Participation Agreement or USRE's decision to loan the $240,000 to GMICC. In fact, Plaintiff and USRE never had any communications at all prior to USRE's funding of the remaining $240,000 of the Note.

54.     Although Defendants Michener and McWalters represented to USRE that

SFCA_429700.1

the GMICC was guaranteed to receive the OPIC loan, and that once GMICC received the OPIC loan, GMICC had a back log of loans and other investment deals which would flow in to GMICC, and that USRE could thereafter convert its loan into equity and obtain a significant return on its investment, Defendants Michener and McWalters knew these representations were false at the time they were made.

55.     The truth was at the time Defendants Michener and McWalters represented that the OPIC loan was guaranteed, these Defendants knew GMICC still had to raise at least $4 million in equity before the OPIC loan would be made, and that they had in fact not raised any equity investment towards that $4 million minimum, and had no realistic chance of doing so before the OPIC loan commitment expired.

56.     In addition, at the time Defendants Michener and McWalters represented that GMICC had a back log of loans and deals which would flow in when the OPIC loan closed, GMICC did not in fact have any such deals consummated, or any such deals even close to being consummated.

57.     USRE would not have made the decision to fund the additional $240,000 under Plaintiff's loan to GMICC if it had known the true facts, but instead Plaintiff, through USRE, justifiably relied on the representations of Defendants Michener and McWalters in deciding to loan the additional $240,000 to GMICC under the terms of the Note.

58.     Plaintiff has been damaged by such reliance in that if USRE had known the true facts it would not have loaned the additional $240,000 through Plaintiff's Note to GMICC.

59.     In addition, USRE and Javed Nawaz have assigned any and all claims they may have against Defendants to Plaintiff, such that Plaintiff may assert such claims in this action.

///

///

SFCA_429700.1

**GMICC Defaults on the Note**

60.    Pursuant to its terms, the $750,000 loaned pursuant to the Note became due and payable in full, and with interest, on December 1, 2004.

61.    GMICC defaulted under the terms of the Note by failing and refusing to repay the debt.

62.    After GMICC defaulted on the Note, Plaintiff brought suit against GMICC for default on the Note in the United States District Court for the Middle District of Florida.

63.    Plaintiff ultimately obtained a monetary judgment against GMICC on or about January 5, 2006 in the principal amount of $971,239.38 (the "Judgment"). A true and correct copy of the Judgment is attached as **Exhibit H**. The Judgment has not been satisfied.

64.    After obtaining the Judgment, Plaintiff conducted post judgment discovery in an attempt to collect on the Judgment during 2006.

65.    It was only in this post judgment discovery in 2006 that Plaintiff discovered, the existence of the emails from Defendant Michener and Defendant Dunn, and thus, the existence of the intentional misrepresentations by Defendants Dunn and Michener, as well as the true facts related to the misrepresentations to USRE.

**GMICC Was Insolvent and/or Operating in the Zone of Insolvency**

66.    At the time the Note was initially funded, and throughout the remainder of 2004, GMICC was in fact insolvent, and/or operating in the vicinity of insolvency.

67.    Specifically, at all times relevant in 2004, GMICC's total liabilities significantly exceeded its total assets. However, this was never revealed to Plaintiff.

68.    By at the latest August 31, 2004, and at all times relevant thereafter, GMICC was unable to pay its liabilities as they became due. Specifically, GMICC's balance sheet for August 31, 2004, reflected that it owed approximately $337,251.54 to its vendors, and that it had only $507.94 in operating capital. The balance sheet also

reflected total liabilities of $1,170,938.81 and total assets of only $197,645.22, indicating a negative net worth of $973,293.59. Therefore, GMICC was insolvent, and remained so through its ultimate dissolution on December 30, 2004. A true and correct copy of GMICC's August 31, 2004 balance sheet is attached hereto as **Exhibit I**.

69. Defendant Michener admitted in a September 28, 2004 email to Javed Nawaz that GMICC was "effectively out of cash" as of September 1, 2004 (the "September 28, 2004 Email"). A true and correct copy of the September 28, 2004 Email is attached hereto as **Exhibit J**.

70. As a result of GMICC's state of insolvency, the Individual Defendants, as officers and directors of GMICC, had fiduciary duties to GMICC's creditors, including its largest creditor, Plaintiff.

71. The original loan commitment from OPIC to GMICC was set to expire on March 15, 2004. However, as the deadline approached, GMICC had not raised enough equity investment to satisfy OPIC's conditions to close the loan. Therefore, GMICC requested and was granted an extension of the OPIC commitment letter until July 1, 2004.

72. As the extended deadline approached, GMICC had still not raised sufficient equity to close the OPIC loan. In fact, GMICC had not raised any equity investment during the entire year of 2004 up to that point. Nevertheless, GMICC's officers continued to represent to Plaintiff and others, including OPIC, that it was very close to securing sufficient equity investment to close the OPIC loan, and requested another extension from OPIC.

73. On or about August 4, 2004, OPIC's Vice President and General Counsel, Mr. Mark Garfinkel, sent GMICC an email informally granting GMICC an additional extension of the commitment letter for ninety days, or until October 20, 2004.

74. Although GMICC requested a letter from OPIC formally extending the commitment in writing, GMICC could not get OPIC to comply and issue such a formal

SFCA_429700.1

extension.

75.    In fact, OPIC ignored GMICC's requests and refused to meet with any of GMICC's representatives about formalizing the extension.    Nevertheless, GMICC continued to rely on the email extension in its efforts to raise equity investment to close the OPIC loan.

76.    In or around September, 2004, as it became apparent that GMICC was essentially out of operating funds, GMICC requested that Plaintiff convert its Note into equity in GMICC.

77.    Plaintiff and GMICC then entered into negotiations regarding whether and under what circumstances Plaintiff would agree to convert the Note into equity. Although Plaintiff's Managing Member, Mr. J. Richard Blankenship ("Mr. Blankenship") had previously been appointed to the GMICC Board of Directors shortly after Plaintiff made the loan to GMICC, due to these negotiations, on or about September 23, 2004, Mr. Blankenship, resigned from the Board of Directors of GMICC in order to avoid any conflict of interest with respect to these negotiations.

### The Individual Defendants Devise a Plan to Dump GMICC and its Debts, Steal its Intangible Assets, and Continue the Same Business With a New Entity

78.    Around this same time, the Officers of GMICC began to privately discuss amongst themselves the fact that they did not want Plaintiff to convert the debt under the terms of the Note because they believed this would give Plaintiff too much ownership and control of GMICC.

79.    Therefore, the officers of GMICC, Defendants Michener, Toy and McWalters, determined that rather than pay back GMICC's debt or allow a conversion under the terms of the Note, they would dissolve GMICC, take GMICC's intangible assets and goodwill and continue with the GMICC business plan through a different corporate entity.

///

///

GIA-GMI, LLC'S FIRST AMENDED COMPLAINT FOR DAMAGES
Case No.:  C 06-7949 SBA

SFCA_429700.1

SFCA_429700.1

80.     The Individual Defendants knew that GMICC did not have significant tangible assets, but rather, its assets were primarily in the form of goodwill with OPIC and other potential investors which had been created using the monies loaned by Plaintiff, as well as legal and accounting work product created towards documenting and closing the OPIC loan, again, which work product had been paid for with Plaintiff's loan monies.

81.     Because of the intangible nature of GMICC's assets in the form of goodwill, the Individual Defendants knew that they could take that goodwill for the benefit of themselves through a new entity, without ever consummating any purchase of those assets.

82.     In other words, the Individual Defendants knew and determined that they could dissolve GMICC and thereby get rid of its debts, take the goodwill of GMICC (without paying for it) and just continue with the same business plan and pursue the same business opportunities with a new entity.

83.     The GMICC Officers planned to involve certain other of the investors in GMICC in the new entity in addition to themselves.  In particular, the then directors of GMICC, Defendants Dunn, Van Ness, Salucci and Austin, were to be given ownership interests in the new entity, as well as the GMICC Officers, Defendants Michener, Toy and McWalters.

84.     In order to effect their plan, the Individual Defendants determined that they would set up a purported asset purchase by the new entity, Pangaea Holdings, LLC, ("Pangaea Holdings") in exchange for an assumption of GMICC's liabilities by Pangaea Holdings, and then dissolve GMICC.

85.     This plan, whereby GMICC would be dissolved after its assets and liabilities had been assumed by Pangaea Holdings, was presented to Plaintiff and GMICC's shareholders in order to obtain shareholder approval of the dissolution of GMICC.

///

86.     However, once GMICC was dissolved, and unbeknownst to Plaintiff, the Individual Defendants planned to demand that Plaintiff agree to pay new money into Pangaea Holdings and agree to a conversion of the debt under the Note on terms highly detrimental to Plaintiff.  The Individual Defendants knew that if Plaintiff refused their demands, they would just take GMICC's intangible assets anyway, and use them to pursue the same business opportunities with Pangaea Holdings regardless.

87.     Once they formulated their plan to dump GMICC and take its intangible assets and business plan to a new entity, the Individual Defendants acted in a manner to benefit themselves and Pangaea Holdings and to the detriment of GMICC, its shareholders and creditors, including Plaintiff.

88.     For example, instead of conserving GMICC's assets, the Officers continued to spend significant sums on travel to Thailand to pursue investment.  In particular, the Officers were pursing an investment deal with the Small and Medium Enterprise Development Bank of Thailand ("Thailand SME Bank"), and caused GMICC to spend almost $9000.00 on travel, entertainment and lodging related to its pursuit of the Thailand SME Bank deal, from September to November, 2004, and after GMICC was insolvent.

89.     This was because the Individual Defendants knew the investment they were seeking from the Thailand SME Bank would be made into the new entity, and not GMICC, because the Individual Defendants had already determined among themselves that they would dissolve GMICC and continue on using its intangible assets (such as the goodwill created with OPIC and the Thailand SME Bank) for themselves.

90.     In addition, the Officers of GMICC, Defendants Michener, McWalters and Toy, began to take personal loans from GMICC which they had no intention of repaying. These loans were never approved, or even discussed, in any of the meeting minutes from any of the meetings of GMICC's Board of Directors.

///

SFCA_429700.1

91.    The loans were documented in the form of promissory notes from each of the individual Officers to GMICC.  However, the promissory notes were drafted by the Officer Defendants themselves so that the notes would automatically be considered repaid if GMICC was dissolved before January 10, 2005.  Since Defendants Michener, McWalters and Toy knew that the plan was to dissolve GMICC, they knew they would never have to repay these loans to GMICC.

92.    Furthermore, because of the way the notes were drafted, the GMICC Officers had a personal incentive to see to it that GMICC was dissolved before January 10, 2005, regardless of whether GMICC's assets were purchased by Pangaea Holdings.

93.    While GMICC was insolvent, Defendants Michener, McWalters and Toy loaned themselves at least a total of $25,500.00 from GMICC, all pursuant to separate promissory notes drafted by these Defendants so that the loans would never have to be repaid.   Unsigned copies of certain of these promissory notes from Defendants McWalters and Toy are attached hereto as **Exhibit K**.  Plaintiff does not have signed copies of all the promissory notes, but on information and belief alleges that Defendants Michener, Toy and McWalters have possession of signed copies of such promissory notes and to the extent such are produced to Plaintiff by Defendants in discovery, Plaintiff will supplement this Complaint appropriately.

94.    The Individual Defendants also acted in furtherance of their owns interests and those of Pangaea Holdings instead of GMICC by failing to act to maximize potential assets of GMICC because they knew that they would dissolve GMICC and continue on with its intangible assets and goodwill with Pangaea, whether or not any asset purchase occurred.

95.    For example, OPIC's failure to ever issue GMICC a formal extension letter for the loan commitment as promised, and refusal to negotiate further with GMICC regarding the closing of the loan, created a potential legal cause of action by GMICC against OPIC for damages.

SFCA_429700.1

96.     In particular, Defendant Toy, an officer of GMICC and a former General Counsel of OPIC, wrote to Defendant Michener in October, 2004, that he believed GMICC had a viable legal claim against OPIC for breach of the commitment letter and breach of the duty to negotiate with GMICC in good faith, as well as other violations of federal regulatory laws. GMICC later made a request to OPIC under the Freedom of Information Act ("FOIA"), in order to obtain documentation to support its potential legal claim for damages against OPIC. A true and correct copy of Defendant Toy's analysis of GMICC's potential legal claims against OPIC is attached hereto as **Exhibit L**.

97.     However, the Individual Defendants never bothered to obtain an outside legal opinion with respect to the viability of GMICC's claims. Rather, once the Individual Defendants determined that they were going to dissolve GMICC and take its intangible assets and goodwill, and continue to pursue a loan from OPIC through the new entity, they determined instead to cause GMICC to give OPIC a general release from all potential legal claims GMICC might have had against OPIC.

98.     There was no consideration given to GMICC for this release, but instead it was purely to preserve the potential for future business with OPIC for Pangaea Holdings, which all of the Individual Defendants knew they would be participating in once they dissolved GMICC, dumped its debts and stole its intangible assets and goodwill.

99.     Further, as part of this release, the Individual Defendants caused GMICC to give up to OPIC a $25,000.00 deposit GMICC had paid to OPIC with loan monies provided by Plaintiff.

100.     GMICC had continually listed this deposit money as an asset on its balance sheets, an asset which the Individual Defendants caused GMICC to release to OPIC without any consideration to GMICC, but purely for their own benefit in continuing to pursue the OPIC loan for themselves through Pangaea Holdings.

///

///

SFCA_429700.1

**The Individual Defendants Put Their Plan Into Action**

101.    In order to put their plan into action, the GMICC Officers sent out a Request for Written Consent in Lieu of a Meeting of the Stockholders to all GMICC shareholders on December 14, 2004 ("Request for Consent").  A true and correct copy of the Request for Consent is attached hereto as **Exhibit M**.

102.    The Request for Consent purported to be an authorized action of the GMICC Board (on which Plaintiff was no longer represented) ratifying the formal action of the GMICC Board taken at a meeting on December 6, 2004.

103.    The Request for Consent requested that the GMICC shareholders consent to GMICC first selling its assets to the new entity in exchange for the new entity agreeing to assume the restructured debts of GMICC, and thereafter, the dissolution and winding up of GMICC.

104.    Again, the Individual Defendants knew that once GMICC was dissolved, they would take its intangible assets and goodwill, regardless of whether any asset purchase was consummated.

105.    However, they purposely drafted the Request for Consent to provide that the dissolution would only occur after there had been an asset purchase by the new entity because they knew that they would be more likely to obtain shareholder consent for such a plan.

106.    Shortly after issuing the Request for Consent, the Individual Defendants further breached their duty of loyalty to GMICC when they approved the payment of an illegal dividend to Defendant Salucci and his company, Defendant CASE, in December, 2004.

107.    As more specifically alleged above, CASE received 187,529 shares of Series B Preferred Stock in GMICC as payment for the CASE Loan Processing Program valued at $187,529.16.  Defendant Salucci, who was at all relevant times a Director of GMICC, was also the principal owner of CASE.

SFCA_429700.1

108.    In December of 2004, Defendant Salucci, on behalf of CASE, secretly agreed with the then Officers and/or Directors of GMICC that GMICC would allow CASE to cancel and rescind the license for the CASE Loan Processing Program. Although this CASE Loan Processing Program had been paid for with GMICC stock, GMICC agreed to allow the return and/or cancellation of the license for the CASE Loan Processing Program valued at $187,529.16.

109.    Prior to this, GMICC had consistently listed this license for the CASE Loan Processing Program as an asset on its balance sheets.  Furthermore, as reflected in the license for the CASE Loan Processing Program, which is attached hereto as **Exhibit N**, the license was completely transferable by GMICC without the consent of CASE. Therefore, GMICC could have sold and transferred the license for valuable consideration rather than allowing CASE to cancel and/or rescind it for no consideration.

110.    GMICC's agreement to rescind and/or cancel the license for the CASE Loan Processing Program was later documented in a March 9, 2005, letter from Defendant Salucci on behalf of CASE to GMI Asia Ltd., and Defendants Michener and McWalters.  A true and correct copy of this letter is attached hereto as **Exhibit O**.

111.    This transaction between CASE and GMICC and/or GMI Asia Ltd. was a conflict of interest transaction in that Defendant Salucci was on both sides of the transaction, as a Board Member of GMICC and as the principal owner of CASE.

112.    Furthermore, the transaction was fundamentally unfair to GMICC and its shareholders and creditors, as CASE, which had been paid for the license in GMICC stock, received value for this stock when the then Officers and Directors of GMICC (which included Defendant Salucci) allowed CASE to rescind the software license and thereby obtain its value (at least $187,529.16) back from the GMICC stock.

113.    In other words, CASE received its money back for its GMICC stock, while GMICC's other stockholders received nothing for their stock.  This conflict of interest transaction also deprived GMICC of a valuable asset, in the form of the software license,

SFCA_429700.1

which GMICC could have assigned to another entity for value.

114. Furthermore, this amounted to the payment of an illegal dividend to CASE at a time when GMICC was insolvent, and when no other shareholders received any value for their stock, and no creditors were repaid.

115. Thereafter, Defendant Michener continued to push forward with the Individual Defendants' plan to dump GMICC by forming the new entity, Pangaea Holdings, LLC ("Pangaea Holdings"), on or about December 27, 2004.

116. Defendant Michener was the initial managing member of Pangaea Holdings. Defendants Toy and McWalters would shortly thereafter become Executive Vice Presidents of Pangaea Holdings. Defendants Dunn, Salucci, Van Ness and Austin would shortly thereafter all become Directors of Pangaea Holdings. All the individual Defendants were given ownership interests in Pangaea Holdings.

117. Subsequently, the Individual Defendants caused GMICC to enter into an asset purchase agreement with Pangaea Holdings ("Asset Purchase Agreement"). Plaintiff does not have a copy of the signed Asset Purchase Agreement, but on information and belief alleges that one or more of the Defendants possesses a copy of the Agreement. To the extent Defendants produce a copy of the Asset Purchase Agreement in discovery, Plaintiff will supplement this Complaint accordingly.

118. As all of the Individual Defendants were at that time still Officers and Directors of GMICC, as well as at a minimum de facto officers, directors and owners of Pangaea Holdings, such individual Defendants were on both sides of this transaction and had inherent conflicts of interest. Furthermore, all of the individual Defendants knew that if Plaintiff refused their demands for payment of new money into Pangaea Holdings, they would terminate the Asset Purchase Agreement, dissolve GMICC regardless, and take its intangible assets and goodwill with OPIC and the Thailand SME Bank for themselves and continue the same business through Pangaea Holdings. Thus, the individual Defendants failed to act in good faith or in compliance with their duty of

SFCA_429700.1

loyalty to GMICC when they entered into the Asset Purchase Agreement with Pangaea Holdings on which they were interested and on both sides of the transaction.

119.     As a result of this conflicted transaction, the Asset Purchase Agreement was one sided and allowed for the Individual Defendants, acting through Pangaea Holdings, to unilaterally reject the Asset Purchase Agreement if Plaintiff rejected their demand for payment of additional money, which is exactly what they planned to do.

120.     As Defendant Dunn communicated to Plaintiff via email on January 10, 2005:

> The new company doesn't need GMICC's assets to do the
> deal with the Thai Government.  Thus, Pangaea can walk out
> on GMICC leaving GMICC with its assets and little or no
> chance of litigating successfully against GMICC, Pangaea or
> any participants in either.

121.     This email from Defendant Dunn was an expression of the Individual Defendants' long standing plan to dump GMICC and its debts, and take its intangible assets and goodwill for their own benefit in order to pursue the same business deals with Pangaea Holdings, regardless of the effect this had on GMICC's shareholders and creditors.  A true and correct copy of the Dunn email is attached hereto as **Exhibit P**.

122.     In fact, prior to this email from Defendant Dunn, the Individual Defendants acted to dissolve GMICC on December 30, 2004, before any such asset purchase had taken place.  This dissolution of GMICC before consummation of any asset purchase was contrary to what was represented to GMICC's shareholders in the Request for Consent, and of course benefited Defendants Michener, Toy and McWalters because upon the dissolution of GMICC before January 10, 2005, the $25,500.00 in personal loans they had taken from GMICC would automatically be considered repaid pursuant to the notes they themselves drafted.

///

SFCA_429700.1

123. Once GMICC was dissolved, the Individual Defendants, who were then also officers, directors and/or owners of Pangaea Holdings, continued their plan by using the additional leverage created by the dissolution of GMICC to try to force Plaintiff to pay additional money into Pangaea Holdings.

124. Again, the Individual Defendants knew that even if Plaintiff refused their demands, they would nevertheless cancel the Asset Purchase Agreement and steal GMICC's intangible assets and goodwill without paying for them in order to pursue the same business opportunities for themselves through the new entity, Pangaea Holdings.

125. As Defendant Michener explained in an email to the other Individual Defendants dated January 10, 2005:

> Pangaea goes back to [Plaintiff] and states flatly that we are willing to convert as per the revised cap table or we will gladly surrender all assets to GIA (noting that the IRS lien goes before him). We can then simply cut the deal with the SME Bank under a newly formed entity in Thailand (which is what Formichella is telling me the Thai's want to do anyway) and file a new application with OPIC under Pangaea as the sponsor (which we were going to do anyway).

A true and correct copy of this email is attached hereto as **Exhibit Q**.

126. This is exactly the course of action the Individual Defendants and Pangaea took, and when Plaintiff rejected their demand for additional money, the Individual Defendants and Pangaea Holdings terminated the Asset Purchase Agreement, left GMICC for dead without paying one cent to Plaintiff or any of GMICC's creditors, stole the intangible assets and goodwill of GMICC, and proceeded to pursue the exact same line of business and business opportunities for themselves with Pangaea Holdings that had been pursued by GMICC.

///

SFCA_429700.1

127.   As explained by Defendant Michener in his January 10, 2006 email, this included continued pursuit of a loan from OPIC.   The Individual Defendants had approved spending considerable sums of GMICC monies (provided by Plaintiff) on legal fees and other expenses in its efforts to pursue the prior OPIC loan, which benefits the Individual Defendants then stole from GMICC for the benefit of themselves and Pangaea Holdings in their efforts to continue to pursue a smaller OPIC loan.

128.   In particular, Pangaea Holdings continued to employ the law firm of Manatt, Phelps and Phillips in its efforts to obtain an OPIC loan for Pangaea, and on information and belief used, or allowed Manatt, Phelps and Phillips to use, legal work product paid for by GMICC in furtherance of Pangaea Holdings' efforts to pursue a loan from OPIC.

129.   In addition, Pangaea Holdings continued to pursue the same investment opportunity from the Thailand SME Bank which GMICC had pursued prior to its dissolution.  The Officers of GMICC had spent considerable sums of GMICC monies on travel and entertainment in efforts to pursue this same investment from the Thailand SME Bank, and in doing so created intangible goodwill with the Thailand SME Bank which the Individual Defendants then improperly took from GMICC and used on behalf of Pangaea Holdings.

130.   In essence, Pangaea Holdings was a mere continuation of GMICC in a different form as Pangaea Holdings had the same management as GMICC since all the Individual Defendants were also involved as officers, directors and/or owners of Pangaea Holdings, and Pangaea Holdings pursued the exact same line of business, and in fact the same business opportunities, which had been pursued by these same Individual Defendants on behalf of GMICC.

131.   Defendant Michener admitted in an email to a prospective investor and copied to Defendant Toy on February 4, 2005, that Pangaea Holdings was the alter ego of GMICC, specifically writing that "[w]e decided to change the names to protect the

SFCA_429700.1

innocent, so we are now operating under the moniker of Pangaea." A true and correct copy of this email is attached hereto as **Exhibit R**.

132. The Individual Defendants continued to pursue these same business opportunities, among others, when in mid-2005, Pangaea Holdings procured a $250,000.00 investment from another entity, Private Equity Management Group, Inc., ("PEMG") to help Pangaea Holdings obtain the OPIC loan.

133. However, because Plaintiff had filed suit against GMICC for default on the Note in April, 2005, and because the Individual Defendants and Pangaea Holdings did not want Plaintiff to learn that Pangaea Holdings was successfully obtaining investment using the same business plan, the Individual Defendants set up another entity, Pangaea Trading Corporation, ("Pangaea Trading"), in which PEMG could make the investment. Although the Individual Defendants never disclosed to PEMG the fact of the litigation between Plaintiff and GMICC, they set up Pangaea Trading as a holding company, half owned by Pangaea Holdings and half owned by PEMG, in an effort to create another corporate layer between the actual investment and GMICC in order to further conceal from Plaintiff the fact of this investment in GMICC's alter ego, Pangaea Holdings.

134. However, Pangaea Trading continued to pursue the same business opportunities and use the same intangible good will created with OPIC and the Thailand SME Bank through GMICC in order to pursue those opportunities on behalf of the Individual Defendants through Pangaea Trading/Pangaea Holdings.

135. As with Pangaea Holdings, the corporate management of Pangaea Trading was made up almost entirely of former officers and directors of GMICC. Defendant Michener was the President and CEO of GMICC, the President of Pangaea Holdings, and the CEO and a Board Member of Pangaea Trading. Defendant Toy was the Executive Vice President of Governmental Affairs of GMICC, the Executive Vice President of Pangaea Holdings and the Executive Vice President of Pangaea Trading. Defendant McWalters was the Chief Credit Officer of GMICC, the Executive Vice President of

SFCA_429700.1

Pangaea Holdings and the Executive Vice President of Pangaea Trading. Defendant Toy was the Executive Vice President of GMICC, the Executive Vice President of Pangaea Holdings and the Executive Vice President of Pangaea Trading. Defendants Dunn, Salucci, Van Ness and Austin were all directors of GMICC, Pangaea Holdings and Pangaea Trading. All the Individual Defendants also had ownership interests in GMICC, Pangaea Holdings and Pangaea Trading.

136. Again, Pangaea Holdings and Pangaea Trading were both a mere a continuation of GMICC, used by the Individual Defendants to pursue the same exact business plan of GMICC and, in fact the same business opportunities, including, but not limited to, with OPIC and the Thailand SME Bank.

137. The foregoing misrepresentations, misleading statements, failures to disclose and breach of fiduciary and other duties constitute wrongful acts by Defendants which have caused significant damages to Plaintiff.

138. All conditions precedent to this action have been performed, waived or otherwise excused.

## COUNT I

### (Fraud in the Inducement)

139. This in an action for fraud against Defendants Michener, Dunn and McWalters for damages which exceed $75,000.00, exclusive of interest and costs.

140. Plaintiff realleges and incorporates herein Paragraphs 1 through 139 above.

141. Plaintiff is informed and believes, and thereon alleges, that each of the above described representations to Plaintiff by Defendants Dunn and Michener in January 2004 - *i.e.*, that GMICC, (1) would raise $1.5 million through Series B equity *prior* and in addition to the OPIC loan, (2) would raise $12.5 million in private capital in addition to the OPIC Loan, (3) would have sufficient cash on hand on December 2004 to pay Plaintiff's loan off in full and in cash, and (4) that the OPIC Loan was virtually certain regardless of the warnings in the 2004 PPM regarding the risk of investment -

SFCA_429700.1

were, in fact, false and were made to Plaintiff by Defendants Dunn and Michener for the sole purpose of inducing Plaintiff to rely upon such false representations and thereby enter the loan arrangement described herein to Plaintiff's detriment. Plaintiff is further informed and believes, and thereon alleges, that Defendants Dunn and Michener knew that the above described representations were, in fact, false when they were made to Plaintiff and that Defendants Dunn and Michener knew that, in fact, GMICC would not have sufficient funds to pay Plaintiff's loan and would not be able to obtain either the OPIC loan or any additional funds through the sale of equity participation offerings or otherwise. Despite knowing that GMICC (and Defendants Dunn and Michener) had no reasonable belief that GMICC could repay Plaintiff's loan by the maturity date, Defendants nevertheless falsely represented to Plaintiff otherwise in order to induce Plaintiff to invest in GMICC through the loan arrangement.

142. In reasonable reliance on the previously described representations by Defendants, Plaintiff entered into the loan to its detriment.

143. Plaintiff has been damaged by such reasonable reliance in that Plaintiff would not have loaned any money to GMICC if Plaintiff had known that Defendants Dunn and Michener representations were false, and that they, in fact knew that had no intention of performing their promises, and therefore, Plaintiff would never have lost the money loaned to GMICC or otherwise been damaged by the loan default.

144. In addition, Plaintiff is informed and believes, and thereon alleges, that each of the above described representations to USRE by Defendants Michener and McWalters on April 29, 2004 - *i.e.*, (1) that GMICC was guaranteed to receive the OPIC loan; (2) GMICC had a back log of loans and other investment deals which would flow in to GMICC, and (3) that once this happened, USRE could convert its loan into equity and obtain a significant return on its investment - were, in fact, false and were made to USRE by Defendants Michener and McWalters for the sole purpose of inducing USRE to rely upon such false representations and thereby loan the remaining $240,000.00 to GMICC

SFCA_429700.1

pursuant to the terms of the Note between Plaintiff and GMICC, to its detriment. Plaintiff is further informed and believes, and thereon alleges, that Defendants Michener and McWalters knew that the above described representations were, in fact, false when they were made and that Defendants Michener and McWalters had no intention of having GMICC meet the above representations but nevertheless made such representations in order to induce USRE to invest in GMICC through the loan arrangement.

145.   Plaintiff is informed and believes, and thereon alleges, that Defendants have acted in other fraudulent ways the details of which will be discovered during the course of this litigation.  Plaintiff shall amend this complaint to alleged such fraudulent actions once such information is obtained.

146.   In justifiable reliance on the representations of Defendants Michener and McWalters, USRE decided to fund the remaining $240,000 of the Note directly to GMICC.

147.   Plaintiff has been damaged by such reasonable reliance in that USRE would not have loaned the additional $240,000 to GMICC pursuant to the terms of the Note if USRE had known that Defendants Michener and McWalter's representations were false, and that they, in fact knew that had no intention of performing their promises, and therefore, Plaintiff would never have lost the money loaned to GMICC or otherwise been damaged by the loan default.

WHEREFORE, Plaintiff, GIA-GMI, LLC demands judgment against Defendants Daniel R. Michener, Allan M. Dunn, and James M. McWalters, jointly and severally, for damages, interest and costs, together with such other and further relief as the Court deems just and proper.

## COUNT II

### (Violation of the Florida Securities and Investor Protection Act)

148.   This in an action for breach of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301, ("FSIPA") against Defendants Michener and Dunn

SFCA_429700.1

for damages which exceed $75,000.00, exclusive of interest, costs and attorney's fees.

149.    Plaintiff realleges and incorporates herein Paragraphs 1 through 139 above.

150.    The Note was a security within the meaning of the FSIPA.

151.    Plaintiff is informed and believes, and thereon alleges, that each of the above described representations to Plaintiff by Defendants Dunn and Michener in January 2004 - *i.e.*, that GMICC, (1) would raise $1.5 million through Series B equity *prior* and in addition to the OPIC loan, (2) would raise $12.5 million in private capital in addition to the OPIC Loan, (3) would have sufficient cash on hand on December 2004 to pay Plaintiff's loan off in full and in cash, and (4) that the OPIC Loan was virtually certain regardless of the warnings in the 2004 PPM regarding the risk of investment - were, in fact, false and were made to Plaintiff by Defendants Dunn and Michener for the sole purpose of inducing Plaintiff to rely upon such false representations and thereby enter the loan arrangement described herein to Plaintiff's detriment.  Plaintiff is further informed and believes, and thereon alleges, that Defendants Dunn and Michener knew that the above described representations were, in fact, false when they were made to Plaintiff and that Defendants Dunn and Michener knew that, in fact, GMICC would not have sufficient funds to pay Plaintiff's loan and would not be able to obtain either the OPIC loan or any additional funds through the sale of equity participation offerings or otherwise.  Despite knowing that GMICC (and Defendants Dunn and Michener) had no reasonable belief that GMICC could repay Plaintiff's loan by the maturity date, Defendants nevertheless falsely represented to Plaintiff otherwise in order to induce Plaintiff to invest in GMICC through the loan arrangement.

152.    In reasonable reliance on the previously described representations by Defendants, Plaintiff entered into the loan to its detriment.

153.    Plaintiff has been damaged by such reasonable reliance in that Plaintiff would not have loaned any money to GMICC if Plaintiff had known that Defendants Dunn and Michener had no intention of performing their promises, and therefore,

SFCA_429700.1

Plaintiff would never have lost the money loaned to GMICC or otherwise been damaged by the loan default.

154. Plaintiff has been damaged by such reliance in that Plaintiff would not have loaned any money to GMICC if Plaintiff had known that Defendants Dunn and Michener had no intention of performing their promises, and therefore, Plaintiff would never have lost the money loaned to GMICC or otherwise been damaged by the loan default.

155. In addition, Plaintiff is informed and believes, and thereon alleges, that each of the above described material representations to USRE by Defendants Michener and McWalters on April 29, 2004 - *i.e.*, (1) that GMICC was guaranteed to receive the OPIC loan; (2) GMICC had a back log of loans and other investment deals which would flow in to GMICC, and (3) that once this happened, USRE could convert its loan into equity and obtain a significant return on its investment - were, in fact, false and were made to USRE by Defendants Michener and McWalters for the sole purpose of inducing USRE to rely upon such false representations and thereby loan the remaining $240,000.00 to GMICC pursuant to the terms of the Note between Plaintiff and GMICC, to its detriment. Plaintiff is further informed and believes, and thereon alleges, that Defendants Michener and McWalters knew that the above described representations were, in fact, false when they were made and that Defendants Michener and McWalters had no intention of having GMICC meet the above representations but nevertheless made such representations in order to induce USRE to invest in GMICC through the loan arrangement.

156. Plaintiff is informed and believes, and thereon alleges, that Defendants have acted in other fraudulent ways the details of which will be discovered during the course of this litigation. Plaintiff shall amend this complaint to alleged such fraudulent actions once such information is obtained.

157. In justifiable reliance on the representations of Defendants Michener and McWalters, USRE decided to fund the remaining $240,000 of the Note directly to

SFCA_429700.1

GMICC.

158.    Plaintiff has been damaged by such reasonable reliance in that USRE would not have loaned the additional $240,000 to GMICC pursuant to the terms of the Note if USRE had known that Defendants Michener and McWalter's representations were false, and that they, in fact knew that had no intention of performing their promises, and therefore, Plaintiff would never have lost the money loaned to GMICC or otherwise been damaged by the loan default.

159.    Plaintiff has been required to retain the undersigned attorneys to represent it in this action and is required to pay said attorneys a reasonable fee for their service for which Defendants Dunn and Michener are responsible pursuant to Fla. Stat. § 517.211.

WHEREFORE, Plaintiff, GIA-GMI, LLC demands judgment against Defendants Daniel R. Michener, Allan M. Dunn and James M. McWalters, jointly and severally, for rescission of the Note, return of alls sums paid under the Note, plus interest, other damages, reasonable attorney's fees and costs, or, alternatively, judgment against Defendants Daniel R. Michener, Allan M. Dunn, and James M. McWalters, jointly and severally, for monetary damages in the form of all sums paid under the Note, plus interest, other damages, reasonable attorney's fees and costs, together with such other and further relief as the Court deems just and proper.

## COUNT III

**(Violation of the Securities Exchange Act of 1934, § 10(b) and Regulation 10b-5)**

160.    This in an action for breach of the Securities Exchange Act of 1934, § 10(b) and 17 C.F.R. § 240.10b-5, against Defendants Michener and Dunn for damages which exceed $75,000.00, exclusive of interest and costs.

161.    Plaintiff realleges and incorporates herein Paragraphs 1 through 139 above.

162.    The Note is a security, and Defendants Dunn and Michener used instrumentalities of interstate commerce, including telephone, mail and electronic mail, in connection with their intentional misrepresentations and omissions of material fact in

SFCA_429700.1

their efforts to induce Plaintiff to invest and loan money to GMICC through the Note as alleged above.

163.    Plaintiff is informed and believes, and thereon alleges, that each of the above described representations to Plaintiff by Defendants Dunn and Michener in January 2004 - *i.e.*, that GMICC, (1) would raise $1.5 million through Series B equity *prior* and in addition to the OPIC loan, (2) would raise $12.5 million in private capital in addition to the OPIC Loan, (3) would have sufficient cash on hand on December 2004 to pay Plaintiff's loan off in full and in cash, and (4) that the OPIC Loan was virtually certain regardless of the warnings in the 2004 PPM regarding the risk of investment - were, in fact, false and were made to Plaintiff by Defendants Dunn and Michener for the sole purpose of inducing Plaintiff to rely upon such false representations and thereby enter the loan arrangement described herein to Plaintiff's detriment.  Plaintiff is further informed and believes, and thereon alleges, that Defendants Dunn and Michener knew that the above described representations were, in fact, false when they were made to Plaintiff and that Defendants Dunn and Michener knew that, in fact, GMICC would not have sufficient funds to pay Plaintiff's loan and would not be able to obtain either the OPIC loan or any additional funds through the sale of equity participation offerings or otherwise.  Despite knowing that GMICC (and Defendants Dunn and Michener) had no reasonable belief that GMICC could repay Plaintiff's loan by the maturity date, Defendants nevertheless falsely represented to Plaintiff otherwise in order to induce Plaintiff to invest in GMICC through the loan arrangement.

164.    In reasonable reliance on the previously described representations by Defendants, Plaintiff entered into the loan to its detriment.

165.    Plaintiff has been damaged by such reasonable reliance in that Plaintiff would not have loaned any money to GMICC if Plaintiff had known that Defendants Dunn and Michener had no intention of performing their promises, and therefore, Plaintiff would never have lost the money loaned to GMICC or otherwise been damaged

SFCA_429700.1

by the loan default.

166.    In addition, Plaintiff is informed and believes, and thereon alleges, that each of the above described material representations to USRE by Defendants Michener and McWalters on April 29, 2004 - *i.e.*, (1) that GMICC was guaranteed to receive the OPIC loan; (2) GMICC had a back log of loans and other investment deals which would flow in to GMICC, and (3) that once this happened, USRE could convert its loan into equity and obtain a significant return on its investment - were, in fact, false and were made to USRE by Defendants Michener and McWalters for the sole purpose of inducing USRE to rely upon such false representations and thereby loan the remaining $240,000.00 to GMICC pursuant to the terms of the Note between Plaintiff and GMICC, to its detriment.    Plaintiff is further informed and believes, and thereon alleges, that Defendants Michener and McWalters knew that the above described representations were, in fact, false when they were made and that Defendants Michener and McWalters had no intention of having GMICC meet the above representations but nevertheless made such representations in order to induce USRE to invest in GMICC through the loan arrangement.

167.    Plaintiff is informed and believes, and thereon alleges, that Defendants have acted in other fraudulent ways the details of which will be discovered during the course of this litigation.    Plaintiff shall amend this complaint to alleged such fraudulent actions once such information is obtained.

168.    In justifiable reliance on the representations of Defendants Michener and McWalters, USRE decided to fund the remaining $240,000 of the Note directly to GMICC.

169.    Plaintiff has been damaged by such reasonable reliance in that USRE would not have loaned the additional $240,000 to GMICC pursuant to the terms of the Note if USRE had known that Defendants Michener and McWalter's representations were false, and that they, in fact knew that had no intention of performing their promises,

SFCA_429700.1

and therefore, USRE would never have lost the money loaned to GMICC or otherwise been damaged by the loan default.

WHEREFORE, Plaintiff, GIA-GMI, LLC demands judgment against Defendants Daniel R. Michener and Allan M. Dunn, jointly and severally, for damages, interest and costs, together with such other and further relief as the Court deems just and proper.

## COUNT IV

### (Breach of Fiduciary Duty)

170.    This is an action for breach of fiduciary duties against Defendants Michener, McWalters, Toy, Dunn, Salucci, Van Ness and Austin for damages which exceed $75,000.00 exclusive of interest and costs.

171.    Plaintiff realleges and incorporates herein Paragraphs 1 through 139 above.

172.    Due to the fact that GMICC was insolvent and/or operating in the zone of insolvency from at least August, 2004 until its dissolution on December 30, 2004, the Individual Defendants owed fiduciary duties to GMICC's creditors, including Plaintiff.

173.    As more specifically alleged above, the Individual Defendants breached their fiduciary duty of loyalty to GMICC because they were conflicted in their dealings with Pangaea Holdings in their positions as both officers and directors of GMICC and actual and/or defacto officers, directors and/or owners of Pangaea Holdings. Furthermore, Defendant Salucci was on both sides of the transaction whereby Defendant CASE was paid an illegal dividend when the Individual Defendants allowed the CASE Loan Processing Program license to be cancelled and/or rescinded.  Because of their conflicts of interest, the Individual Defendants committed several acts or omissions for the benefit of themselves, CASE and the Pangaea entities and to the detriment of GMICC, its shareholders and creditors, which breaches include, but are not limited to, the following:

a.    While GMICC was insolvent, Defendants Michener, Toy and McWalters took personal loans from GMICC in the total amount of $25,500.00

SFCA_429700.1

pursuant to promissory notes drafted by these Defendants so that they would never have to be repaid, which loans were never approved by the GMICC Board or documented in any Board meeting minutes;

b.       The Individual Defendants agreed to give OPIC a release of GMICC's potential legal claims for damages against OPIC and to release to OPIC a GMICC asset of a $25,000.00 deposit with OPIC for no consideration to GMICC, but rather for the sole reason that the Individual Defendants wanted to preserve the potential for their future business with OPIC through Pangaea Holdings;

c.       The Individual Defendants agreed to pay an illegal dividend to Defendant CASE by allowing CASE to cancel and/or rescind the CASE Loan Processing Program license which had been paid for with GMICC stock;

d.       The Individual Defendants caused GMICC to enter into the Asset Purchase Agreement with Pangaea Holdings when all such Individual Defendants were on both sides of the transaction, which conflict of interest caused the Asset Purchase Agreement to be one sided and unfair to GMICC because it allowed for the Individual Defendants, through Pangaea Holdings, to unilaterally reject the Agreement if Plaintiff refused the Individual Defendants' demand for Plaintiff to pay new additional monies into Pangaea Holdings;

e.       After Plaintiff refused the Individual Defendants' demand for additional money, the Individual Defendants took GMICC's intangible assets and goodwill from GMICC without payment of any consideration to GMICC, and used those assets for their own benefit in Pangaea Holdings/Pangaea Trading; and

f.       The Individual Defendants, through Pangaea Holdings and Pangaea Trading, pursued corporate opportunities for the Pangaea entities, which opportunities were rightfully those of GMICC, including, but not limited to, the

GIA-GMI, LLC'S FIRST AMENDED COMPLAINT FOR DAMAGES
Case No.:  C 06-7949 SBA

SFCA_429700.1

opportunity to pursue a new, smaller OPIC loan, the opportunity to obtain investment from the Thailand SME Bank and the investment from PEMG.

174.    Plaintiff has been damaged by the Individual Defendants' breach of their fiduciary duty of loyalty.

WHEREFORE, Plaintiff, GIA-GMI, LLC demands judgment against Defendants Daniel R. Michener, James M. McWalters, Charles D. Toy, Allan M. Dunn, Larry J. Austin, W. Denman Van Ness and Michael P. Salucci, jointly and severally, for damages, interest and costs, together with such other and further relief as the Court deems just and proper.

## COUNT V

### (Action to Recover Payment of Illegal Dividend)

175.    This is an action against all Defendants CASE, Salucci, Van Ness, Dunn, Austin, Michener, Toy and McWalters for damages which exceed $75,000.00 exclusive of interests and costs.

176.    Plaintiff realleges and incorporates herein Paragraphs 1 through 139 above.

177.    As more specifically alleged above, the agreement between the Individual Defendants and CASE to the cancel and/or rescind the license for the CASE Loan Processing Program amounted to the payment of an illegal dividend to CASE at a time when GMICC was insolvent, when no other shareholders received any value for their stock, and when CASE knew of the insolvent financial condition of GMICC.

178.    Defendants are jointly and severally liable to Plaintiff for their payment and/or receipt of this illegal dividend.

WHEREFORE, Plaintiff, GIA-GMI, LLC demands judgment against Defendants Computer and Software Enterprises, Inc., Michael P. Salucci, Daniel R. Michener, James M. McWalters, Charles D. Toy, Allan M. Dunn, Larry J. Austin and W. Denman Van Ness, jointly and severally, for damages, interest and costs, together with such other and further relief as the Court deems just and proper.

SFCA_429700.1

# COUNT VI

## (Successor Liability)

179. This is an action against Defendants Pangaea Holdings and Pangaea Trading for damages which exceed $75,000.00 exclusive of interests and costs.

180. Plaintiff realleges and incorporates herein Paragraphs 1 through 139 above.

181. Plaintiff obtained a Judgment on January 4, 2006 against GMICC based on its default under the Note and Security Agreement in the principal amount of $971,239.38. The Judgment remains unsatisfied due to the fact that GMICC was dissolved by the Individual Defendants on December 30, 2004.

182. As more specifically alleged above, Pangaea Holdings and Pangaea Trading were mere continuations and/or alter egos of GMICC formed by the Individual Defendants for the sole reason of allowing the Individual Defendants to take the intangible assets and goodwill of GMICC without any consideration to GMICC, and to continue with pursuit of the exact same business opportunities of GMICC while avoiding the just claims of creditors of GMICC, such as Plaintiff.

183. As such, Defendants Pangaea Holdings and Pangaea Trading are liable for the debts of GMICC, including Plaintiff's Judgment based on the Note.

WHEREFORE, Plaintiff, GIA-GMI, LLC demands judgment against Defendants Pangaea Holdings, LLC and Pangaea Trading Corporation, jointly and severally, for damages, interest and costs, together with such other and further relief as the Court deems just and proper.

///
///
///
///
///
///

SFCA_429700.1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that the claims made in this complaint and any associated cross-claim or counter claim be tried to a jury.

DATED: APRIL 25, 2007

EILEEN R. RIDLEY
FOLEY & LARDNER LLP


BY:   **/s/**
_____
EILEEN R. RIDLEY
ATTORNEYS FOR PLAINTIFF,
GIA-GMI, LLC

SFCA_429700.1