**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIA-GMI, LLC, a Florida Limited Liability Company, | No. C 06-7949 SBA |
| Plaintiff, | **ORDER** |
| v. | [Docket Nos. 50 & 52] |
| DANIEL R. MICHENER, an individual, JAMES M. MCWALTERS, an individual, CHARLES D. TOY, an individual, ALLAN M. DUNN, an individual, LARRY J. AUSTIN, an individual, W. DENMAN VAN NESS, an individual, MICHAEL P. SALUCCI, an individual, COMPUTER AND SOFTWARE ENTERPRISES, INC., a California corporation, PANGAEA HOLDINGS, LLC, a dissolved Delaware limited liability company, and PANGAEA TRADING CORPORATION, a Delaware corporation | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion to Dismiss the First Amended Complaint [Docket No. 50] and Request for Judicial Notice [Docket No. 52]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion to Dismiss the First Amended Complaint. The Request for Judicial Notice is GRANTED.

**BACKGROUND**

**I.    Factual Background**

In its First Amended Complaint, filed after the Court dismissed Counts I-III of its original Complaint, Plaintiff GIA-GMI again asserts claims for common law fraudulent inducement under Florida law (Count I), for violation of the Florida Securities and Investor Protection Act, Fla. Stat. § 517.01 1, et. seq., ("FSIPA") (Count II), and for violation of the Securities Exchange Act of 1934, § 10(b) (Count III). Plaintiff alleges that defendants Allan Dunn and Daniel Michener fraudulently induced Plaintiff to enter a the loan transaction with GMI Capital Corporation ("GMICC") for an initial $510,000 convertible secured promissory note ("Note"), which Note could be funded up to $750,000. Later, Michener and defendant James McWalters allegedly induced the funding of another $240,000 in GMICC under the Note by another company, U.S. Real Estate Consortium, LLC ("USRE"). The USRE transaction was done pursuant to a participation agreement in the Note, and Plaintiff now brings USRE's claims by assignment.

**A.    Fraud on GIA-GMI**

In or about late December of 2003, two of the defendants, Alan Dunn and Dan Michener, approached Plaintiff about the possibility of investing in GMICC. FAC, ¶ 26. GMICC was a new venture, whose business plan was to operate as a non-regulated private finance company that would provide loans to small to medium enterprise technology companies in emerging markets such as Thailand and Singapore. *Id.,* ¶ 17. One primary source of funds for GMICC to finance such loans was intended to be the Overseas Private Investment Corporation ("OPIC"). *Id.,* ¶ 18. OPIC is a federal government corporation whose purpose is to mobilize and facilitate the participation of United States private capital and skills in the economic and social development of less developed countries and areas. *Id.*, ¶ 19.

At the time GMICC approached Plaintiff, it had already obtained a conditional commitment letter from OPIC for a $25 million loan. *Id.*, ¶ 21. Dunn and Michener gave Plaintiff a copy of GMICC's private placement memorandum (the "PPM") dated January 2004, which contained consolidated projected financial statements for GMICC and its subsidiaries. FAC, ¶ 26, and Exhibit B (the PPM). In

making its investment, Plaintiff relied on the representations in the PPM. *Id.*, ¶ 31. Most significantly, the PPM expressly warned that failure to obtain OPIC financing would render GMICC unable to execute its business plan. The PPM stated that "there [was] no assurance that GMICC would be successful in managing its relationship with OPIC, which would cause GMICC to "be unable to execute [its] business plan by obtaining low-cost debt…." *Id.* Exh. B at 12.

In addition, the PPM warned Plaintiff that an investment in GMICC "involves a high degree of risk and investors must be prepared to withstand the loss of their entire investment." *Id.* The PPM also disclosed that GMICC was "a new company with no significant operating history," that it was "entering a market that is highly volatile," warned that the technology industry in which GMICC intended to invest was also volatile, and finally, stated "[t]here is no assurance of profit, appreciation, or liquidity" *Id.* The PPM also represented that (1) GMICC planned to raise $1.5 million through a Series B equity offering prior to the receipt of the OPIC loan; (2) to complement the OPIC Loan, GMICC would then raise another $12.5 million in private capital; and (3) GMICC was projected to have "Cash at Bank" at the end of 2004 of $1,504,950. FAC, ¶ 27.

After Defendants initially approached Plaintiff's managing member Richard Blankenship about the equity investment, Plaintiff informed them that it "was not interested in an equity investment in GMICC but, instead, was interested in an investment in the form of a secured loan, which would be repaid with interest, or could be converted into equity at Plaintiff's sole option based upon certain pre-conditions." FAC, ¶ 28. Plaintiff alleges that, "knowing Plaintiff wanted its loan to be repaid in cash rather than converted into equity," Defendants expressly represented to Plaintiff in January 2004 that, notwithstanding the general warnings in the PPM regarding the risk of any investment, the OPIC loan was "virtually certain"[1] given (1) the September 2003 commitment letter; (2) the additional financing anticipated by Defendants (the Series B and Series C financing) as well as Dunn's personal relationship

---

[1] It appears that the term "virtually certain" is Plaintiff's characterization of defendants' representations to it rather than defendants' own words. While Plaintiff frequently puts the term "virtually certain" in quotes, implying that it is quoting the words of defendants, the term initially does not appear in quotes in the FAC, and quoted versions of this term later in the FAC therefore appear to be references to the initial appearance of the term in the FAC. As explained below, Plaintiff's "interpretations" of various statements made by defendants, at odds as they are with the plain meaning of the statements themselves, is not sufficient for the FAC to withstand dismissal.

with the President of OPIC. FAC, ¶ 29. Also in January 2004, Dunn and Michener orally represented to Plaintiff that GMICC would have sufficient cash to repay his loan though the $1.5 million Series B equity raise, and/or the $12.5 million Series C equity raise and/or through the OPIC loan funds and/or through funds from business operations. FAC, ¶ 30. On January 23, 2004, defendant Dunn made a further representation to Plaintiff via an email that Plaintiff could obtain a "cash payment at closing [of the OPIC Loan] in a in a few months." FAC, ¶ 38, Ex. E.

Plaintiff alleges that Defendants knew these representations were false and that they had no intent to honor them when they made these representations to Plaintiff. FAC, ¶ 36. Plaintiff alleges Defendants knew that they were not going to repay Plaintiffs loan in cash as promised, but instead were going to "require" Plaintiff to convert the loan into equity in GMICC. FAC, ¶ 40. As evidence of this intent, Plaintiff offers an internal email which Plaintiff characterizes as demonstrating Defendants' "belief that cash payment to Plaintiff would be impossible." FAC, ¶ 40. In an email from Michener to Dunn, Michener states that "the Series C [investors] won't put $$$ in if there is a clause that allows the [Plaintiff] to take $500,000 to $600,000 out of the company when the Series C is funded." FAC, ¶ 37. Plaintiff alleges that the statements in this email show that "Dunn and Michener knew at the time the above-described representations to Plaintiff were made that they were not going to repay Plaintiff's loan in cash (as required or as they had promised), or maintain sufficient cash in GMICC to do so. . . ." *Id.*, ¶ 37. Plaintiff further alleges that the emailed statements, if known to Plaintiff, would have revealed the falsity of both the representations in the PPM and defendants' oral representations to Plaintiff that GMICC would have sufficient cash to repay the Note by the end of 2004. *Id.*, ¶¶ 37-38.

Plaintiff further alleges that Defendants did not plan to use any cash assets of GMICC to repay Plaintiff promised because "they planned to use those assets for, among other things, payments to themselves as salaries and/or hidden fees." FAC, ¶ 40. Finally, Plaintiff alleges that Defendants knew that the viability of the OPIC loan was not "virtually certain" as promised, but was in fact in peril due to the undisclosed fact that GMICC was then having serious problems raising the requisite financing for the OPIC Loan. FAC, ¶ 40.

4

**B.     Fraud on USRE**

In addition to Defendants' alleged fraudulent inducement of the loan transaction and initial funding of the Note, Plaintiff also alleges Michener and McWalters fraudulently induced USRE into funding an additional $240,000 to GMICC pursuant to the terms of the Note. Specifically, Plaintiff alleges that Michener and McWalters contacted USRE's principal, Javed Nawaz, to attempt to convince USRE to invest in GMICC by funding the final $240,000 of the Note. FAC, ¶ 46. On April 29, 2004, Defendants Michener and McWalters met with Vawaz, and the attorney for Nawaz and USRE, in order to solicit USRE's investment. FAC ¶ 47. During the meeting, Michener and McWalters allegedly orally represented that (1) GMICC was guaranteed to receive the OPIC loan shortly; (2) GMICC had a back log of loans and other investment deals which would flow into GMICC once it received the OPIC Loan; and (3) once GMICC received the OPIC loan the back log of loans and investment deals would start flowing, so that USRE could convert its loan into equity and obtain a significant return. FAC ¶ 48.

Plaintiff alleges Defendants made these representations to USRE with the intent that USRE would rely on them and agree to fund the remaining $240,000 to GMICC under the terms of the Note, however, according to Plaintiff, these representations were false when made. The true facts, according to Plaintiff, were that, rather than the OPIC loan being guaranteed to come in shortly, the Defendants knew GMICC still had to raise at least $4 million in equity before the OPIC loan would be made, and that they had in fact not raised any equity towards the $4 million minimum and had no realistic chance of doing so. FAC, ¶ 55. In addition, Michener and McWalters knew that, rather than a back log of loans and other investment deals, GMICC did not in fact have any such deals consummated or even close to being consummated. FAC, ¶ 56.

**II.    Procedural Background**

In its original Complaint, Plaintiff alleged fraud-based claims for 1) common law fraud, 2) violation of the Florida Securities Investor Protection Act, Fla. Stat. § 517.01 et seq., and 3) violation of Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5. Compl., ¶¶ 117-138. Plaintiff's fraud claims were premised on the non-disclosure of an internal cash projection that Michener prepared and emailed to Dunn in January of 2004, which Plaintiff obtained in post-judgment discovery in the Florida

5

litigation. *Id.*, ¶ 123. The cash flow projections were attached to and incorporated in the Complaint as Exhibit C. Plaintiff alleged that on January 19, 2004, Michener emailed to Dunn "some preliminary cash budgets" based on two scenarios, one with a $500,000 investment by Plaintiff and one with a $750,000 investment. *See id.*., Exh. C at 1. These preliminary cash budgets were not provided to Plaintiff at the time it made the $750,000 loan to Defendants. *Id.*, ¶ 35.

Plaintiff alleged that the projections showed that "even if GMICC received the OPIC loan, GMICC would not have sufficient funds to repay Plaintiff by the end of 2004 as promised" and thus, the projections constituted material true facts, that if known, would have revealed the falsity of both the representations in the PPM and Defendants' oral representations to Plaintiff that GMICC would have sufficient cash to repay the Note by the end of 2004 if OPIC funded the loan to GMICC. *Id.*, ¶¶ 33, 130 and 138. However, upon reviewing the projections, the Court held that the budget demonstrated that defendants, contrary to Plaintiff's allegations, in fact planned to pay back Plaintiff's loan in full, with interest. Specifically, the Court stated:

> What Plaintiff inexplicably fails to acknowledge, however, is that the $318,371 and $281,421 amounts in Exhibit C represent GMICC's projected cash surplus *after repayment of Plaintiff's Note*. The $500,000 projection shows, in the January 2004 column, cash from "Debt" (Plaintiff's loan) of $500,000. In June 2004 Defendants project additional cash being received as they receive equity investments totaling $12.5 million from the OPIC loan, and allotting the entity $335,000 in management fees. However, *at this point Defendants project payoff of the entire loan from Plaintiff*. This can clearly be seen from the negative entry ($500,000) in the "Debt" row for cash, which corresponds to the $500,000 proceeds from Plaintiff in January. Cash, rather than being increased by proceeds from the Plaintiff as it is in January, is being decreased by the payoff of the Note in June. In addition to projecting payoff of the principal amount of the loan from Plaintiff, Defendants also project payment of $22,687 in interest to Plaintiff, which is based on the 10% rate in the Note, for the approximately five months that the loan is projected to be outstanding. The $750,000 projection is based on very similar assumptions, and also shows that the loan from Plaintiff is projected to be paid off in June 2004. The $318,371 and $281,421 amounts represent total cash remaining *after Plaintiff's loan is repaid*.

April 5, 2007 Order [Docket No. 23], 8:16-18 (emphasis in original).

In other words, the Court found that Plaintiff had "inexplicably" adopted an "interpretation" of the budget projections that was simply false, and was plainly belied by an even cursory examination of the projections themselves. The Court accordingly held that "[a]ll of Plaintiff's fraud-based claims, based as they are solely on the non-disclosure of the budget projections at Exhibit C, therefore must

6

fail." *Id.* The Court dismissed Counts I-III of the Complaint, and granted Plaintiff leave to amend "**only if** it can allege, in good faith an adequate factual basis" for its allegations. *Id.* (emphasis in original).

## LEGAL STANDARD

### I.     Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955,1960 (2007). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Everest & Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir. 1994).  All reasonable inferences are to be drawn in favor of the plaintiff.  *Jacobson v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir. 1997).

The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *see Miranda v. Clark County, Nev.*, 279 F.3d 1102, 1106 (9th Cir. 2002) ("[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 987 ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."), *as amended by*, 275 F.3d 1187 (9th Cir. 2001).

### II.    Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) provides as follows:

> In all averments of fraud or mistake, the circumstances constituting  fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b).

The Ninth Circuit has interpreted Rule 9(b) to require that "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (quoting *Semegen v. Weidner*, 780 F.2d

7

727, 731 (9th Cir. 1985)). "The pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir. 1986) (citing *Semegen*, 780 F.2d at 731).

### III.     Pleading Requirements in Securities Fraud Actions

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under the authority of Section 10(b), in turn, provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Thus, the basic elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Systems, Inc.* 411 F.3d 1006, 1014 (9th Cir. 2005).

In order to survive a motion to dismiss, a Section 10(b) claim must satisfy three pleading standards. First, it must meet the general requirements established by Federal Rule of Civil Procedure 8(a) that complaints give a short and plain statement of the claim. Second, it must conform with the particularity requirements of Rule 9(b). *Neubronner*, 6 F.3d at 671. Third, it must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA").

The PSLRA employs heightened pleading standards for claims brought under Section 10(b) and, similar to Rule 9(b), requires pleading with particularity for two elements in a Section 10(b) claim: (1) falsity and (2) scienter. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). "If a plaintiff fails to plead either the alleged misleading

8

statements or scienter with particularity, the court must dismiss the complaint." *Carol Gamble Trust 86 v. E-Rex, Inc.*, 84 Fed.Appx. 975, 977 (9th Cir. 2004).

Thus, under both the PSLRA and Rule 9(b), a plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. *See* 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b). This is accomplished by identifying either (1) inconsistent contemporaneous statements; or (2) inconsistent contemporaneous information (such as an internal document) that was made by or available to the Defendants. *In re Splash Technology Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, *13 (N.D. Cal. 1997); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

With respect to scienter, the PSLRA also requires that the plaintiff 'state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind' for each alleged act or omission. 15 U.S.C. § 78u-4(b)(2). "Deliberate recklessness" is the required state of mind and will satisfy scienter if it "reflects some degree of intentional or conscious misconduct." *Nursing Home*, 380 F.3d at 1230 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999). A complaint will not survive if it just relies on generic allegations. *See Silicon Graphics,* 183 F.3d at 974, 985. To assess whether a plaintiff has sufficiently pled scienter, a court must consider "whether the total of plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home*, 380 F.3d at 1230. Additionally, a court must consider "all reasonable inferences, whether or not favorable to the plaintiff." *Id.* (citing *Gompper*, 298 F.3d at 897).

**IV.  Florida Securities Investor Protection Act**

The elements of a claim under Rule 10b-5 and the elements of a claim the Florida Securities Investor Protection Act, Fla. Stat. § 517.01 et seq. ("FSIPA") are similar. To state a cause of action under Section 517.301, a party must allege and prove: (1) a misrepresentation or omission of a material fact; (2) that the investor justifiably relied on said misrepresentation or omission; (3) that the misrepresentation or omission was made in connection with a purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communication; and (5) that the untruth was the direct

proximate cause of the investor's actual loss. *First Union Brokerage v. Milos*, 717 F.Supp. 1519, 1523 (S.D. Fla.1989), *aff'd*, 997 F.2d 835 (11th Cir.1993). The primary differences concerning the Florida statute are that scienter is satisfied by showing a showing of mere negligence, rather than reckless disregard, and that a plaintiff must plead justifiable reliance. *Profilet v. Cambridge Financial Corp.*, 231 B.R. 373, 381 (S.D. Fla.1999).

## ANALYSIS

**I.    Fraud on GIA-GMI**

   **A.    Non-Disclosure of the Matters in the January 15, 2004 Email**

As with its original Complaint, Plaintiff's allegations in the FAC are based on mischaracterizations of documents which it attaches to the FAC, which mischaracterizations are contradicted by the plain meaning of the documents on their face. Plaintiff's case-in-chief with respect to the fraud allegedly perpetrated on GMI-GIA is that the non-disclosure of the matters discussed in the Exhibit D email constituted an omission of material fact.[2] FAC, ¶ 37. To be actionable, those matters must demonstrate the falsity of representations that were made to the Plaintiff via the PPM and otherwise.

Plaintiff alleges that the statements made in the Exhibit D email are expressly contrary to defendants' contemporaneous promises that GMICC would have sufficient cash in December 2004 to repay the Note. FAC, ¶ 37. In the January 15, 2004 email, Michener states:

> The issue of conversion at the note holders option and the mandatory prepayment is key for us to resolve. The issue is that the Series C won't put $$$ in if there is a clause that allows [the Plaintiff] to take $500,000 to $600,000 out of the company when the Series C is funded. They will most likely ask him to change this and convert if the clause remains. This puts GMI in a precarious position of possibly having to give more compensation to the Ambassador to remove the clause and convert to get the Series C in the door and will without doubt cost us time (and time is revenue for us). Therefore, we really need to get this out of the document or amended so that the Series C dollars are comfortable that this loan will convert when they fund the deal. I am willing to consider

---

[2] In addition to Exhibit D, Plaintiff argues in its opposition that two other emails, one from January 23, 2004 (Exhibit E) and one from January 19, 2004 support its allegations in the FAC. Defendant's argument with respect to Exhibit E is dependant on the success of its argument that Exhibit D shows that defendants did not plan to repay Plaintiff in cash. The January 19, 2004 email, referenced at ¶ 39 of the FAC but not attached to it, is the very email which the Court held in its order on the previous motion to dismiss actually demonstrate that defendants *did* intend to pay back Plaintiff in cash, with interest.

10

> a pricing give up to get this changed, if necessary, but prefer to simply negotiate it out based on logic first.

FAC, Ex. D. Plaintiff asserts that, contrary to defendants' representations, this email shows that defendants did not believe that they would be able to pay back the note when the Series C investment was funded:

> [This email shows that] Defendants Dunn and Michener knew at the time the above-described representations to Plaintiff were made that they were not going to repay Plaintiff's loan in cash (as required or as they had promised), or maintain sufficient cash in GMICC to do so, but were instead planning on having the debt to Plaintiff converted into equity – even though they knew that that was not Plaintiff's desire and that Plaintiff retained the sole right of such a conversion.

FAC, ¶ 37. Plaintiff argues that although Dunn and Michener purportedly represented that Plaintiff would be repaid in cash, they in fact believed that repaying Plaintiff in cash "would be impossible" under their business plan because they believed GMICC's Series C investors would not put money in GMICC if GMICC was going to repay Plaintiff's loan in cash as Defendants had promised. *See* Opp. at 9. Instead, Defendants believed that the Series C investors would only invest in GMICC if Plaintiff's loan was to be converted into equity rather than repaid. *Id.*

However, as with the emails attached to its dismissed original Complaint, Exhibit D simply does not say what Plaintiff says it does. First, as Plaintiff repeatedly alleges in the FAC, defendants purportedly represented to Plaintiff that it would be able to pay back the Note "*either* through the $1.5 million raised through Series B equity stock, and/*or* through the $12.5 million raised through private capital (the "Series C"), and/*or* through the funds received through the OPIC loan and/or from funds through business operations." FAC, ¶ 30 (emphasis added). The email only relates to the Series C funding and states nothing about "Series B equity stock," the OPIC loan, or "funds through business operations," all of which were, according to Plaintiff, represented to be potential sources for repayment of the funds. Thus, according to Plaintiff's own allegations, the email is entirely consistent with the loan being repaid from sources other than the Series C.

More importantly, the statement that " the Series C won't put $$$ in if there is a clause that allows [the Plaintiff] to take $500,000 to $600,000 out of the company when the Series C is funded" does not in demonstrate that defendants "knew" that they would not be able to repay the loan. Rather,

11

the email suggests that wholly unidentified potential investors would be unlikely to invest an unspecified sum ("$$$") if the "*mandatory prepayment*" provision remained unamended in the Note. This key issue, which Plaintiff wholly neglects, is that the email does not say that the Series C investors "won't put $$$" into GMICC if Plaintiff's loan is *repaid*; rather, it refers to a mandatory *prepayment* clause, which presumably would have required GMICC to repay the Note earlier than the maturity date upon receipt of additional investment money, i.e. when the "Series C is funded." *See* FAC, Exh. D. Thus, the email only goes to the possibility that mandatory prepayment would hinder Series C investment. It does not say, contrary to Plaintiff's representations in the FAC, that the Note could not be repaid by its maturity date even if the Series C round of investment was unsuccessful. Moreover, the email does not even state that the mandatory prepayment provision must be wholly excised from the document, rather it suggest that an "amended" mandatory prepayment provision would be sufficient in the alternative.

As Defendant points out, any mandatory prepayment provision *was in fact ultimately excised from the Note*. FAC, Exh. C. In fact, the only provision concerning prepayment is at B.2, and specifically prohibits prepayment without the lender's consent: "Borrower shall not have the right to prepay all or any portion of the amounts outstanding under this Note, except upon the prior written consent of Lender." Thus, the very condition which defendants were concerned would inhibit Series C investment was ultimately not contained in the Note. Plaintiff's argument that the email demonstrating the defendants' concerns regarding a provision which was not in fact part of the loan entered into therefore cannot demonstrate that defendant "knew" the loan ultimately could not be repaid.

Moreover, the email actually demonstrates that, at the time, defendants believed they may ultimately obtain the OPIC loan, and therefore repay Plaintiff even *before* the supposedly problematic Series C investment was obtained, as it discussed issues related to the seniority of Plaintiff's loan in the event the OPIC loan was signed before the Series C investment closed. The email simply expresses a desire to negotiate certain terms with the Plaintiff, which, apparently were in fact ultimately successfully negotiated as evidenced by the terms of the Note.

Plaintiff's conclusory allegation that the email demonstrates a nefarious intent is not supported by the contents of the email. The Court need not accept as true unreasonable inferences or conclusory

12

legal allegations cast in the form of factual allegations. *See Western Mining*, 643 F.2d at 624. Plaintiff's failure to allege any facts showing knowing falsity renders all of its fraud claims defective. "[G]eneral averments of the defendants' knowledge of material falsity will not suffice. Consistent with Fed. R. Civ. P. 9(b), the complaint must set forth 'specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading.'" *Rhodes v. Omega Research, Inc.*, 38 F. Supp. 2d 1353, 1363 (S.D. Fla. 1999) (citations omitted). *See also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1553 (9th Cir. 1994), *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297 (C.D. Cal.1996) (complaint that omits allegations explaining how statements concerning company's good health were false when made fail to meet FRCP 9(b)'s particularity requirement). Plaintiff cannot sidestep the heightened pleading requirements for fraud by simply mischaracterizing documents it attaches to the FAC.

### C. The Bespeaks Caution Doctrine

Plaintiff read and relied upon the PPM, attached as Exhibit B to the FAC. The PPM contained numerous warnings about the riskiness of any investment in GMICC, including that "there [was] no assurance that GMICC would be successful in managing its relationship with OPIC, which would cause GMICC to "be unable to execute [its] business plan by obtaining low-cost debt…." FAC, Ex. B at 12, and that an investment in GMICC "involves a high degree of risk and investors must be prepared to withstand the loss of their entire investment." *Id.* The PPM also disclosed that GMICC was "a new company with no significant operating history," and stated "[t]here is no assurance of profit, appreciation, or *liquidity*" (emphasis added). *Id.* at 12-13. Specifically, the PPM disclosed that "[i]f the Series C Preferred offering does not close, management believes that we will run out of funds and have to cease operating our business, and our stockholders may lose their entire investment." *Id.*, Ex. B at 13. This warning was headed by a caption in bold stating "**No assurance that the Series C Preferred offering will close**." *Id.*

Nevertheless, in the face of these explicit statements, Plaintiff alleges that it simultaneously relied on defendants' supposed oral statements directly to the contrary that the OPIC loan was "virtually certain." FAC, ¶ 40. Defendant argues that under the "bespeaks caution doctrine," the statements in the

13

PPM were sufficiently cautionary that Plaintiff's alleged reliance on optimistic forward-looking oral statements by defendants is unreasonable as a matter of law. The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law that a defendant's forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005). The Ninth Circuit has applied the bespeaks caution doctrine in situations where "optimistic projections coupled with cautionary language ... affect the reasonableness of reliance on and the materiality of those projections." *Id.* (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir.1994)).

Plaintiff respond that the bespeaks caution doctrine does not apply here because the purportedly false representations alleged are not forward-looking statements and the cautionary language in the PPM was not sufficiently precise to put Plaintiff on notice of the risk. The bespeaks caution doctrine does not apply to representations of present or historical facts that were false when made, but only to forward-looking statements. *Livid Holdings,* 416 F.3d 940 at 947. Plaintiff curiously argues that the statement that "the OPIC loan was virtually certain to close shortly" is not a forward looking-statement. Opp at 19-21. Indeed, Plaintiff acknowledges that "this representation does have some forward looking aspect," but argues that it also "encompasses" a representation of a present fact, namely, that the "efforts to obtain the OPIC loan were going so well that the status of the OPIC loan was that it was virtually certain." *Id.* As can be seen, Plaintiff is unable to even formulate a cogent statement of this argument – to say that "the status of the OPIC loan" was that it was "virtually certain" is simply to say that it was "virtually certain" that the OPIC loan would be obtained in the future. Plaintiff's attempt to avoid the application of the bespeaks caution doctrine therefore fails.

In order for the bespeaks caution doctrine to apply, the cautionary language must relate directly to the misrepresentations that forms the basis of the claims. *In re Worlds of Wonder*, 35 F.3d at 1415 ("the language bespeaking caution [must] relate directly to that [as] to which plaintiffs claim to have been misled."). Here, the language in the PPM goes precisely to the issues about which Plaintiff claims it was misled: while Plaintiff alleges that defendants orally represented that the OPIC loan was "virtually

14

certain,"[3] the PPM expressly warned that it might not obtain OPIC financing. The PPM stated that "there [was] no assurance that GMICC would be successful in managing its relationship with OPIC, which would cause GMICC to "be unable to execute [its] business plan by obtaining low-cost debt…." *Id.* The PPM also warns

> we must raise at least $12.5 million in the Series C Preferred Offering to obtain low-cost debt through our relationship with OPIC. . . . We cannot assure you we will be able to meet all of these conditions and that the financing will close. If the Series C Preferred Offering does not close, management believes that we will run out of funds and have to cease operating our business….

*Id.* Thus, the warnings in the PPM are highly specific and directly contradictory to the supposed oral representations regarding the certainty of the loans. This is not the type of generic and boilerplate cautionary language courts have found insufficient to insulate false representations. *See e.g., In re Arnvlin Pharmaceuticals, Inc. Securities Lit.*, 2003 WL 21500525, *7 (S.D. Cal. 2003). The bespeaks caution doctrine therefore precludes Plaintiff from alleging that it was not on notice of the possibility that the OPIC loan might not be obtained. Accordingly, Plaintiff's claims based on fraud allegedly perpetrated against GIA-GMI are dismissed.

## II.     Fraud on USRE

Plaintiff alleges that defendants told USRE, whose claim Plaintiff pursues by assignment, that the OPIC loan was "guaranteed to be received shortly," that "other funds" would flow into GMICC once the OPIC loan was received, and that when the other funds "flowed in," the investor could convert the Note into stock and receive a "significant return."

Rule 9(b) requires that Plaintiff allege with particularity all statements of the time, place and nature of the alleged fraudulent activities, and not merely make conclusory allegations of fraud. *Wool*, 818 F.2d at 1439. Plaintiff has alleged (1) the time of the fraudulent representations: April 29, 2004; (2) the place they were made: during a meeting between Michener and McWalters and USRE; and (3) the nature of the representations: that (a) the GMICC was guaranteed to receive the OPIC Loan shortly; (b) that GMICC had a back log of loans and other investment deals which would flow into GMICC and (c)

---

[3]*But see* fn.1, *supra*.

that once GMICC received the OPIC Loan and the back log of loans and investment deals started flowing, USRE could convert its loan into equity and obtain a significant return on its investment. FAC, ¶¶ 47-49.

Plaintiff argues that it has alleged specific facts showing why these representations by Defendants were false when made giving rise to a strong inference of scienter required by the PSLRA. Specifically, Plaintiff has alleged that contrary to Defendants' representations, GMICC was not guaranteed to receive the OPIC Loan shortly, but instead the true facts were that GMICC still had to raise at least $4 million in equity before the OPIC loan would be made, and GMICC had in fact not raised any equity towards the $4 million minimum and had "no realistic chance of doing so." Moreover, GMICC not only did not have a back log of loans and other deals as Defendant's represented to USRE, but in fact, GMICC "had absolutely no consummated loans or deals, or any even close to being consummated." FAC, ¶¶ 54-56.

Unlike Rule 9(b), which does not require the plaintiff to plead scienter, "[t]he PSLRA raised the pleading standards for Rule 10b-5 claims by requiring that plaintiffs plead scienter by 'stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Livid Holdings Ltd.*, 416 F.3d at 946 (quoting 15 U.S.C. § 78u- 4(b)(2) (1997)). In order to plead scienter under the PSLRA, a plaintiff is required to "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Livid Holdings Ltd.*, 416 F.3d at 948 (quoting *In re Silicon Graphics. Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). The facts alleged in the FAC must be taken as true for purposes of Defendants' Motion to Dismiss. As alleged, they contradict Michener and McWalter's contemporaneous representations to USRE, thereby raising a strong inference of either deliberately reckless or conscious misconduct by Michener and McWalters, and therefore satisfy the PSLRA. *See In re Dura Pharmaceuticals*, 452 F. Supp. 2d at 1017.

Defendants fail to address the fraud with respect to USRE other than to footnote, without elaboration, the statement that "[t]here are *no* facts alleged concerning the alleged knowing falsity of these representations." Mot. at 14, fn.1. However, as stated above, Plaintiff specifically alleges the factual basis its claims of the falsity of the statements purportedly made to Plaintiff. Defendants'

arguments related to the general cautionary statements in the January 2004 PPM do not apply to Plaintiff's fraud claims related to USRE because there is no allegation that USRE was ever provided the PPM by Defendants or otherwise received or reviewed the PPM prior to the representations or its investment. Accordingly, Plaintiff's claims with respect to the representations made to USRE cannot be dismissed for failure to comply with the pleading standards related to either fraud *simpliciter* or securities fraud.

**III.   Extrinsic Evidence**

In support of their Motion to Dismiss, Defendants seek to submit extrinsic evidence by affidavit in which Michener avers that he sent a particular email to Plaintiff on January 16, 2004, which demonstrates that certain of the allegations in the FAC are false. Plaintiff objects to defendants' efforts to interject extrinsic evidence before the Court on their Motion to Dismiss, and requests that, in the event the Court considers the extrinsic evidence, it allow Plaintiff a continuance to conduct further discover pursuant to Federal Rule of Civil Procedure 56(f). As the Court did not consider the extrinsic evidence in granting in part the motion to dismiss, it did not convert the motion to dismiss into a summary judgment motion.

**CONCLUSION**

The Motion to Dismiss the First Amended Complaint is GRANTED with respect to GMI-GIA's claims in Counts I-III, and DENIED with respect USRE's claims, which Plaintiff pursues by assignment. Plaintiff has now twice based its fraud claims on patently false characterizations of documents it attached to its complaints. Moreover, even after the incoherence of its prior "interpretation" was pointed out by the Court, Plaintiff continues to adhere to its unintelligible claims.[4] While this "mistake" could initially have been attributed to mathematical ineptitude, continued

---

[4] *See* Opp. at 4-5, fn. 3: "Although Plaintiff respectfully disagrees with the Court's interpretation of the budgets because it believes the budgets show only a conversion of Plaintiff's debt into stock, not a cash repayment as promised, the Court apparently rejected this interpretation, as Plaintiff raised this argument in its opposition to the original Motion to Dismiss. Thus . . .Plaintiff [still] believes the budgets were and are evidence of Defendants' intent not to repay Plaintiffs loan in cash as promised ...."

17

adherence to this theory once its clear falsity has been pointed out by the Court can only be in bad faith.[5] The Court granted Plaintiff leave to amend "**only if** it can allege, in good faith an adequate factual basis" for its allegations, and for the second time Plaintiff has based its claims on mischaracterizations of documents it attaches to its complaint. Accordingly, the Motion to Dismiss is granted with respect to GMI-GIA's claims in Counts I-III, this time **without** leave to amend. Defendant's Request for Judicial Notice, requesting that the Court take judicial notice of Docket Nos. 1, 27 and 37 in this matter pursuant to Federal Rule of Evidence 201 is GRANTED.

IT IS SO ORDERED.

Dated: 7/16/07

*Saundra B Armstrong*

SAUNDRA BROWN ARMSTRONG

United States District Judge

---

[5] Tellingly, despite the fact that it felt the issue salient enough to mention in its subsequent opposition, Plaintiff presented absolutely *no* argument for it in its first opposition, beyond the bald assertion that the budgets show only a conversion of Plaintiff's debt into stock and not a cash repayment.

18